The **CITY OF NEW YORK and Rudolph Giuliani, as Mayor of the City of New York, Plaintiffs–Appellants,**

v.

The **UNITED STATES of America and Janet Reno, as Attorney General of the United States, Defendants–Appellees.**

Docket No. 97–6182

United States Court of Appeals, Second Circuit.

Argued June 11, 1998.

Decided May 27, 1999.

30

Deborah R. Douglas, Assistant Corporation Counsel for the City of New York (Jeffrey D. Friedlander, Acting Corporation Counsel, and Kristin M. Helmers, Assistant Corporation Counsel, of counsel),

New York, New York, for Plaintiffs–Appellants.

Martin J. Siegel, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney, and Sara L. Shudofsky, Assistant United States Attorney, of counsel), New York, New York, for Defendants–Appellees.

Helaine Barnett, The Legal Aid Society (Scott A. Rosenberg, Hwan–Hui Helen Lee, of counsel), New York, New York, for Amicus Curiae The Legal Aid Society in support of Plaintiffs–Appellants.

B e f o r e: WINTER, Chief Judge, WALKER, and JACOBS, Circuit Judges.

WINTER, Chief Judge:

The City of New York prohibits its employees from voluntarily providing federal immigration authorities with information concerning the immigration status of any alien. In 1996, Congress passed Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act"), Pub.L. No. 104–193, 110 Stat. 2105 (1996), and Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Immigration Reform Act"), Pub.L. No. 104–208, 110 Stat. 3009 (1996). These Sections prohibit state and local governments from limiting their employees in the voluntary provision of information about the immigration status of aliens to the Immigration and Naturalization Service ("INS"). The City and Mayor Rudolph Giuliani (collectively, "the City") appeal from Judge Koeltl's dismissal of their action challenging the facial constitutionality of those enactments. We hold that both Sections survive the City's facial challenge and therefore affirm.

## BACKGROUND

In August 1989, Edward Koch, then New York City's mayor, issued Executive Order No. 124. The Order prohibits any City officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities unless: (i) such employee's agency is required by law to disclose such information, (ii) an alien explicitly authorizes a City agency to verify his or her immigration status, or (iii) an alien is suspected by a City agency of engaging in criminal behavior.[1] However, even if a

---

1. Executive Order 124 provides in pertinent part:

    Section 2. Confidentiality of Information Respecting Aliens.

    a. No City officer or employee shall transmit information respecting any alien to federal immigration authorities unless (1) such officer's or employee's agency is required by law to disclose information respecting such alien, or (2) such agency has been authorized, in writing signed by such alien, to verify such alien's immigration status, or (3) such alien is suspected by such agency of engaging in criminal activity, including an attempt to obtain public assistance benefits through the use of fraudulent documents.

    b. Each agency shall designate one or more officers or employees who shall be responsible for receiving reports from such agency's line workers on aliens suspected of criminal activity and for determining, on a case by case basis, what action, if any, to take on such reports.

    No such determination shall be made by any line worker, nor shall any line worker transmit information respecting any alien directly to federal immigration authorities.

    c. Enforcement agencies, including the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity. However, such agencies shall not transmit to federal authorities information respecting any alien who is the victim of a crime.

    Section 3. Availability of City Services to Aliens.

    Any service provided by a City agency shall be made available to all aliens who are otherwise eligible for such service unless such agency is required by law to deny eligibility for such service to aliens. Every City agency shall encourage aliens to make use of those services provided by such agency for which aliens are not denied eligibility by law.

City agency's line workers suspect an alien of criminal activity, the Executive Order prohibits them from transmitting information regarding such alien directly to the federal authorities. Instead, it requires each agency to designate certain officers or employees to receive reports on suspected criminal activity from line workers and to determine on a case by case basis what action, if any, to take on such reports. Mayor Koch's successors, David Dinkins and Rudolph Giuliani, have reissued the Executive Order.

On August 22, 1996, the President signed the Welfare Reform Act into law. Section 434, entitled "Communication between State and Local Government Agencies and the Immigration and Naturalization Service," provides that no state or local government entity may be restricted from exchanging information with the INS regarding the immigration status, lawful or unlawful, of individuals in the United States.[2] The Conference Report accompanying the bill explained: "The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens.... The conferees believe that immigration law enforce-

ment is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Conf. Rep. No. 104–725, at 383 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2649, 2771.

On September 30, 1996, the Immigration Reform Act was signed into law. Section 642, entitled "Communication between Government Agencies and the Immigration and the Naturalization Service," expands Section 434 by prohibiting any government entity or official from restricting any other government entity or official from exchanging information with the INS about the immigration or citizenship status of any individual. It further provides that no governmental agency—federal, state, or local—may be prohibited from: (i) exchanging such information with the INS; (ii) maintaining such information; or (iii) exchanging such information with any other federal, state, or local government entity.[3] The Report of the Senate Judiciary Committee accompanying the Senate Bill explained that the "acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of con-

**2.** Section 434 provides:

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**3.** Section 642 of the Immigration Reform Act provides:

(a) IN GENERAL.—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES.—Notwithstanding

any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) OBLIGATION TO RESPOND TO INQUIRIES.—The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

siderable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S.Rep. No. 104–249, at 19–20 (1996).

Eleven days after the Immigration Reform Act was signed by the President, the City commenced this action against the United States (the "Government") for declaratory and injunctive relief, claiming that Sections 434 and 642 do not invalidate the City's Executive Order because they are facially unconstitutional. Specifically, the City contended that Sections 434 and 642, which are directed at state and local government entities (or officials) and not private parties, violate the Tenth Amendment because they directly forbid state and local government entities from controlling the use of information regarding the immigration status of individuals obtained in the course of their official business. The City maintained further that such interference with a state's control over its own workforce—*i.e.*, over its power to determine the duties of its employees with regard to confidential information that the employees acquire in their official capacity—lies outside Congress's plenary power over immigration. Finally, the City argued that Sections 434 and 642 violate the Guarantee Clause of Article IV of the Constitution.

After both parties moved for judgment on the pleadings under Fed.R.Civ.P. 12(c), the district court granted the Government's motion and dismissed the City's claims, holding that Sections 434 and 642 violate neither the Tenth Amendment nor the Guarantee Clause. This appeal followed.

## DISCUSSION

■ We review *de novo* a district court's dismissal of a complaint under Fed. R.Civ.P. 12(c). *See Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996).

■ The City's burden in this case is substantial. As the Supreme Court has noted, "[a] facial challenge to a legislative Act is … the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Because the Supreme Court has not recognized an "overbreadth" doctrine outside the limited context of the First Amendment, a showing that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *General Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1456 (2d Cir.1991); *accord United States v. Sage*, 92 F.3d 101, 106 (2d Cir.1996).

## A. The Tenth Amendment Claim

■ The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. In *New York v. United States*, 505 U.S. 144, 157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Supreme Court viewed the Tenth Amendment as "confirm[ing] that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." For example, the Tenth Amendment limits the power of Congress to regulate by "'directly compelling [states] to enact and enforce a federal regulatory program.'" *Id.* at 161, 112 S.Ct. 2408 (quoting *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). State governments, the Court explained, are not federal regulatory agencies. *See id.* at 163, 178, 112 S.Ct. 2408. Thus, however plenary Congress's power to legislate in a particular area may be, the Tenth Amendment prohibits Congress from commanding states to administer a federal regulatory program in that area. Moreover, "Congress cannot circumvent that prohibition by conscripting the State's

officers directly." *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914 (1997).

■■■ The City does not dispute that Congress has plenary power to legislate on the subject of aliens. As the Supreme Court explained in *Takahashi v. Fish and Game Commission*:

> The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.

334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *see also Hines v. Davidowitz,* 312 U.S. 52, 66, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government" that federal policy in this area always takes precedence over state policy). Rather, the City asserts that the Tenth Amendment prohibits Congress from exercising its power to regulate aliens in a way that forbids states and localities from enacting laws that essentially restrict state and local officials from cooperating in the federal regulation of aliens, even on a voluntary basis.

The City's Tenth Amendment claim rests on two basic arguments. The first is that the scope of state sovereignty under the Amendment includes the power to choose not to participate in federal regulatory programs and that such power in turn includes the authority to forbid state or local agencies, officials, and employees from *aiding* such a program even on a voluntary basis. The second argument is that the federal government may not use its powers to legislate in certain areas to disrupt the actual operation of state and local government by, for example, regulating the use of state and local resources—here officially-acquired information—and/or the duties or responsibilities of state and local employees.

The City's scope-of-state-sovereignty argument relies principally upon language in *Printz,* 117 S.Ct. at 2384, and *New York,* 505 U.S. at 168, 112 S.Ct. 2408, that suggests that states may not be denied a bona fide choice as to whether or not to participate in a federal regulatory program. In the City's view, such a choice includes the power to forbid even voluntary cooperation by state and local officials and workers in such a federal program. We do not read these cases so broadly.

■■■ Unlike Sections 434 and 642, the federal programs in *Printz* and *New York* conscripted states (or their officers) to enact or administer federal regulatory programs. *See Printz,* 117 S.Ct. at 2376 (distinguishing federal directives to states that "require only the provision of information to the Federal Government" from those that "force[ ][the] participation of the States' executive in the actual administration of a federal program," even though both kinds of directive leave states with no "choice" but to comply). The central teaching of these cases is that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York,* 505 U.S. at 166, 112 S.Ct. 2408. Congress may not, therefore, directly compel states or localities to enact or to administer policies or programs adopted by the federal government. It may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution. Such a reallocation would not only diminish the political accountability of both state and federal officers, *see New York,* 505 U.S. at 168, 112 S.Ct. 2408; *Printz,* 117 S.Ct. at 2382, but it would also "compromise the structural framework of dual sovereignty," *Printz,* 117 S.Ct. at 2383, and separation of powers, *see id.* at 2378 ("[T]he power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply re-

quiring state officers to execute its laws."). Thus, while Congress may condition federal funding on state compliance with a federal regulatory scheme or preempt state powers in particular areas, *see New York*, 505 U.S. at 166–68, 112 S.Ct. 2408, it may not directly force states to assume enforcement or administrative responsibilities constitutionally vested in the federal government.[4]

In the case of Sections 434 and 642, Congress has not compelled state and local governments to enact or administer any federal regulatory program. Nor has it affirmatively conscripted states, localities, or their employees into the federal government's service. These Sections do not directly compel states or localities to require or prohibit anything. Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the INS. *See Printz*, 117 S.Ct. at 2376.

The City's sovereignty argument asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs. If Congress may not forbid states from outlawing even voluntary cooperation with federal programs by state and local officials, states will at times have the power to frustrate effectuation of some programs. Absent any cooperation at all from local officials, some federal programs may fail or fall short of their goals unless federal officials resort to legal processes in every routine or trivial matter, often a practical impossibility. For example, resistance to *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was often in the nature of a refusal by local government to cooperate until under a court order to do so.

■ A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes. *See Barnett Bank v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citing *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

■ We therefore hold that states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs. Given that the City's challenge to Sections 434 and 642 is facial and that the Executive Order is on its face a mandatory non-cooperation directive relating solely to a particular federal program, we need not locate with precision the line between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs. It suffices to say that, at least in the context of the City's facial challenge, Sections 434 and 642 are of the latter variety.

---

4. This prohibition stands even if state officials "consent" to such federal directives. *See New York*, 505 U.S. at 182, 112 S.Ct. 2408 ("Where Congress exceeds its authority relative to the States, ... the departure from the constitutional plan cannot be ratified by the 'consent' of state officials.... State officials thus cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution."). Again, "consent" and "choice" are not, by themselves, significant for purposes of Tenth Amendment analysis.

We turn now to the argument that Sections 434 and 642 offend the Tenth Amendment because they interfere with the operations of state and local government by regulating: (i) the use of confidential information that state and local governments acquire in the course of official business and that therefore belongs to the particular governmental entity and (ii) the scope and nature of the duties of employees of state and local governments regarding such information.

In support of its position regarding interference with the use of officially acquired information, the City argues that *Printz* invalidated certain provisions of the Brady Handgun Violence Prevention Act on the ground that "[t]he Brady Act does not merely require [chief law enforcement officers] to report information in their private possession ... [but also] requires them to provide *information that belongs to the State and is available to them only in their official capacity.*" *Printz*, 117 S.Ct. at 2383 n. 17 (emphasis added). Thus, the City argues, although Sections 434 and 642 do not require any state or local official to provide the INS with information that belongs to state and local government, these provisions nevertheless eviscerate its control over such information.

With regard to its argument concerning its power to direct its workforce, the City argues that inherent in our dual-sovereignty system is the power of state and local governments to determine the duties and responsibilities of their employees. In particular, it relies on *Gregory v. Ashcroft*, which stated:

> [t]hrough the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive, and free from external interference, except so far as plainly

provided by the Constitution of the United States."

501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *Taylor v. Beckham,* 178 U.S. 548, 570–71, 20 S.Ct. 890, 44 L.Ed. 1187 (1900)). Moreover, "[w]hatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies." *Koog v. United States,* 79 F.3d 452, 460 (5th Cir.1996).

The City's concerns are not insubstantial. The obtaining of pertinent information, which is essential to the performance of a wide variety of state and local governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved. Preserving confidentiality may in turn require that state and local governments regulate the use of such information by their employees. Finally, it is undeniable that Sections 434 and 642 do interfere with the City's control over confidential information obtained in the course of municipal business and over its employees' use of such information.

Nevertheless, the City has chosen to litigate this issue in a way that fails to demonstrate an impermissible intrusion on state and local power to control information obtained in the course of official business or to regulate the duties and responsibilities of state and local governmental employees. On the present record, the only state and local policy proffered by the City as disrupted by Sections 434 and 642 is the Executive Order described above. The City's facial challenge thus rests entirely on the interference of Sections 434 and 642 with that Executive Order and that Order alone.

The Executive Order is not a general policy that limits the disclosure of confidential information to only specific persons or agencies or prohibits such dissemination generally. Rather, it applies only to infor-

mation about immigration status and bars City employees from voluntarily providing such information only to federal immigration officials. On its face, it singles out a particular federal policy for non-cooperation while allowing City employees to share freely the information in question with the rest of the world. It imposes a policy of no-voluntary-cooperation that does not protect confidential information generally but does operate to reduce the effectiveness of a federal policy. For example, the City argues that the Executive Order is essential to the provision of municipal services and to the reporting of crimes because these governmental functions often require the obtaining of information from aliens who will be reluctant to give it absent assurances of confidentiality. But again, the Executive Order does not on its face prevent the sharing of information with anyone outside the INS.

At oral argument, the panel invited the City to inform us whether the information covered by the Executive Order might in fact be subject to other confidentiality provisions that would prevent its dissemination generally. If so, the Executive Order might be viewed more as an explanatory measure designed to reassure aliens that information they might impart was truly confidential, even from the INS. In that context, the Executive Order might seem more integral to the operation of City government, and Sections 434 and 642 might seem more intrusive. We invited the City to inform us by letter of other such confidentiality policies. However, the City's response provided us only with a list of policies that might or might not protect information about immigration status. Noting that "[e]xisting confidentiality statutes and regulations are numerous and . . . pervasive throughout State and City government," Appellants' Post–Argument Letter Brief at 1, the City's letter left it to us to determine the answer to our inquiry. We decline the task and limit our inquiry solely to the facial effect of Sections 434 and 642 on the Executive Order.

Given the circumscribed nature of our inquiry, we uphold Sections 434 and 642. Essentially, the foregoing discussion relating to the power of states to command passive resistance to federal programs governs the analysis here. The effect of those Sections here is to nullify an Order that singles out and forbids voluntary cooperation with federal immigration officials. Whether these Sections would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status is not before us and we offer no opinion on that question.

### B. The Republican Form of Government Claim

The City also contends that Sections 434 and 642 violate the Constitution's Guarantee Clause, which provides: "The United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. The City argues that by denying it the opportunity to enact and enforce its Executive Order, Sections 434 and 642 impermissibly interfere with the City's republican form of government.

Even assuming the justiciability of this claim, cf. New York, 505 U.S. at 183–86, 112 S.Ct. 2408, for the reasons stated above, we find on this record that Section 434's and 642's interference with the city's Executive Order is entirely permissible and in no way alters the form of New York City's government.

We therefore affirm.