**Jane DOE 1, et al., Plaintiffs,**

v.

**Alan G. MERTEN, et al., Defendants.**

No. CIV.A.03–1113–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 5, 2004.

---

Luis Alberto Parada, Arnold & Porter, Catherine Rebekkah Rowland, Arnold & Porter, Washington, DC, for Plaintiffs/Movants.

William Henry Hurd, James V. Ingold, Jerry Kilgore, Alison Paige Landry, Maureen Fay Riley Matsen, Andrew Cameron O'Brion, Office of the Attorney General, Richmond, VA, William Eugene Thro, Christopher Newport University, Newport News, VA, for Defendants/Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this constitutional challenge to the alleged policies of various Virginia colleges and universities to deny admission to illegal alien applicants is whether the individual plaintiffs should be permitted to proceed anonymously.

### I.[1]

Plaintiffs in this case include one association and five anonymous students who either (1) currently attend Virginia public high schools; (2) have recently graduated from Virginia public high schools, or (3) currently attend a Virginia community college. A more detailed description of each plaintiff is important to the analysis.

Plaintiff Equal Access Education ("EAE") is an unincorporated association whose mission is (1) to promote the welfare and education of all minority and immigrant individuals in Virginia, and (2) to obtain access to post-secondary education for all individuals, including those with undocumented status. EAE's members include current and former Virginia public high school students, and Virginia community college students who are not United States citizens or lawful permanent residents, and who, according to the complaint, "may be believed to have an 'illegal,' 'unlawful' or 'undocumented' immigration status." Two of the individual Doe plaintiffs are EAE members.

Jane Doe 1 is 17 years old. She entered the United States on a now-expired tourist visa with her mother at the age of 14 and graduated in 2003 from a public high school in Virginia. She is unlawfully present in the United States. Her father, however, has filed an initial application with the Department of Labor to legalize his immigration status through an employment petition. This petition specifically lists Jane Doe 1 and the rest of her immediate family as derivative beneficiaries.[2]

Jane Doe 2 is 19 years old. She entered the United States with her mother at the age of 13 on a now-expired tourist visa. In 2003, she graduated from a public high school in Virginia. At some point thereafter, Jane Doe 2's father became a lawful permanent resident and filed an immigrant visa petition on behalf of Jane Doe 2 and her mother with the then-existing Immigration and Naturalization Service ("INS"). Jane Doe 2 and her mother were unlawfully present in the United States for the first three years they were awaiting the adjudication of this immigration visa petition. After Congress passed the Legal Immigration and Family Equity ("LIFE") Act of 2000,[3] however, Jane Doe 2, together with her mother, applied to INS for non-immigrant "V" status available for immediate family members of legal permanent residents awaiting adjudication of their immigrant petitions for three or more years. This application succeeded; as a result, Jane Doe 2 acquired "V" status and is now legally

---

1. The facts recited here are taken from plaintiffs' amended complaint, as well as their "Pleading Ordered by the Court with Additional Information about Plaintiffs."

2. According to plaintiffs, Jane Doe 1 and her family have no realistic prospect of legalizing their immigration status through this employ-

ment petition under current immigration law. The family has not submitted any application to the Bureau of Citizenship and Immigration Services ("BCIS") because they are ineligible to do so under current immigration law.

3. Pub.L. No. 106–553, § 1(a)(2), 114 Stat. 2762 (2000).

present in this country and has a valid social security card and employment authorization, both issued by the federal government.[4]

Jane Doe 3 is 21 years old. She entered the United States with her family at the age of 12 on a now-expired tourist visa. She graduated from a Virginia public high school in 2001. She is currently unlawfully present in the United States. Her father, however, has initiated an application with the Department of Labor to legalize his immigration through employment. This application specifically lists Jane Doe 3 and the rest of her family as derivative beneficiaries of the application. According to plaintiffs, however, this initial application has been discontinued for reasons beyond the control of Jane Doe 3 and the rest of her family.[5]

John Doe 1 is 17 years old. He entered the United States at the age of 3 with his mother on a now-expired tourist visa. He has attended Virginia public schools since kindergarten. He expects to graduate from high school in June 2004. Although John Doe 1 is unlawfully present in the United States, he has a social security number and an employment identification document issued by BCIS while he awaits adjudication of his I–881 application for suspension of depor-

tation under the Nicaraguan Adjustment and Central American Relief Act ("NACARA").[6] If granted, his application will result in lawful permanent resident status.[7]

The fifth individual plaintiff, John Doe 2, is 19 years old. He entered the United States without inspection at age 12 to be reunited with his parents who were already in the United States. He attended a Virginia public high school, from which he graduated in 2003. John Doe 2 was unlawfully present in the United States until the federal government granted Temporary Protected Status ("TPS") to the nationals of his country. Because John Doe 2 currently maintains TPS status, he has a valid social security number and an employment authorization card issued by the federal government.[8]

According to the complaint, these individually-named plaintiffs have taken the PSAT or the SAT, have exceptional high school or college grade point averages and PSAT or SAT scores and intend to pursue higher education in Virginia. Those currently attending a community college intend to transfer to a Virginia four-year college or university.

Defendants are the presidents and rectors of six of Virginia's state-supported, residen-

---

4. In addition, Jane Doe 2's father has now become a United States citizen, thus enabling Jane Doe 2 and her mother to apply for a further adjustment of their status to legal permanent residents. They have filed such an application with the BCIS, which is currently pending. Jane Doe 2's "V" status will expire in January 2004. According to plaintiffs, she will not be able to renew her "V" status because her father is now a United States citizen and "V" status is limited to immediate family members of legal permanent residents. While there is a comparable category for immediate family members of United States citizens, it is limited to those family members applying from outside the United States. Therefore, should BCIS not approve Jane Doe 2's application for adjustment of status by January 2004, she would revert to being unlawfully present in the United States and thus subject to deportation.

5. Even if her father were to initiate a new application, plaintiffs proffer that Jane Doe 3 can no longer be a derivative beneficiary because she recently turned 21 and, notwithstanding the provisions of the Child Status Protection Act of 2002, any new I–140 petition would not have been filed by the time she turned 21. Jane Doe 3 and her family have not filed any applications

with BCIS because they are ineligible to do so under current immigration law.

6. Pub.L. No. 105–100, 111 Stat. 2160 (1997).

7. Plaintiffs proffer that while BCIS processes John Doe 1's NACARA application, he is subject to being placed in deportation proceedings by the enforcement arm of the Department of Homeland Security, namely the Bureau of Immigration and Customs Enforcement ("BICE").

8. Any protection that John Doe 2 has under TPS will last only until the expiration of the TPS program, which is currently set for March 2005. Upon termination of his TPS status, John Doe 2 will revert to being unlawfully present in the United States and thus be subject to removal, unless his immigration situation changes. In this regard, John Doe 2 plans to file a NACARA application after he becomes eligible to do so in July of next year. This would enable him to legalize his status permanently if his application is approved. Plaintiffs proffer, however, that the adjudication of a NACARA application normally takes several years and would likely take John Doe 2 past the expiration date of the TPS program.

tial institutions of higher education—George Mason University, James Madison University, University of Virginia, Virginia Commonwealth University, Virginia Polytechnic Institute and State University, and The College of William and Mary—as well as the President and Board Chairman of Northern Virginia Community College.[9] The individual members of the Board of Visitors of these institutions are also named defendants.[10] All defendants are sued in their official capacities.

Plaintiffs allege that although they fall within acceptable academic ranges for admission to the seven institutions over which defendants preside, they would or have been denied admission, and will continue to be denied admission, to these institutions based on their actual or perceived immigration status. Plaintiffs also fear applying to these educational institutions because the Virginia Attorney General has issued a memorandum addressed to Virginia's state-supported colleges and universities recommending that all Virginia public institutions and colleges report all individuals they suspect to have an illegal or undocumented immigration status to the Virginia Attorney General and to the federal government.

For their causes of action, plaintiffs claim (i) that defendants' policies of using immigration status as a determinative factor for admission into their institutions violates the Supremacy Clause of the United States Constitution, Art. VI, cl. 2, and the Commerce with Foreign Nations Clause, Art. I, sec. 8, cl. 3. Based on these claims, plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, as well as reasonable attorneys' fees, expenses and costs pursuant to 42 U.S.C. § 1988. Preliminarily, they also seek an order granting them permission to file their complaint and proceed anonymously through the use of fictitious names. In support of this request, the individual plaintiffs claim that if they are required to reveal their identities, the federal government will seek to deport them or their families and they will thus likely decide not to proceed with this suit, effectively rendering them unable to vindicate their rights in this matter.

## II.

■ Rule 10(a), Fed.R.Civ.P., states that "in the complaint the title of the action shall include the names of all parties." This rule embodies the presumption, firmly rooted in American law, of openness in judicial proceedings. Indeed, this presumption harks back to the English common law, where there existed a rule of openness in both criminal trials and civil proceedings. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 384–91, 386 n. 15, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (noting that history demonstrates existence of a common-law rule requiring open criminal and civil trials). This long-standing common law presumption of openness in judicial proceedings also enjoys firm constitutional support in the form of settled precedent that emphasizes the role of First Amendment protections of freedom of speech and press in safeguarding the public's right to attend trials and prohibiting the government from limiting the public's access to trials. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 100 S.Ct. 2814,

9. These named defendants are: Edwin Meese, III, Rector of the Board of Visitors of George Mason University and Alan G. Merten, President of George Mason University (collectively "GMU"); Joseph C. Ferrell, Rector of the Board of Visitors of James Madison University and Linwood H. Rose, President of James Madison University (collectively "JMU"); Mary Jo Rasmussen, Chair of the College Board of Northern Virginia Community College and Robert G. Templin, Jr., President of Northern Virginia Community College (collectively "NVCC"); Gordon F. Rainey, Jr., Rector of the Board of Visitors of the University of Virginia, and John T. Casteen, III, President of the University of Virginia (collectively "UVA"); W. Baxter Perkinson, Jr., Rector of the Board of Visitors of Virginia Commonwealth University, and Eugene P. Trani, President of Virginia Commonwealth University (collectively "VCU"); John G. Rocovich, Jr., Rector of the Board of Visitors of Virginia Polytechnic Institute and State University, and Charles W. Steger, President of Virginia Polytechnic Institute and State University (collectively "Virginia Tech"); Susan A, Magill, Rector of the Board of Visitors of the College of William and Mary, and Timothy J. Sullivan, President of the College of William and Mary (collectively "William & Mary").

10. These individuals are too numerous for their names to be set forth here.

65 L.Ed.2d 973 (1980). Trials must be open to the public absent an overriding and clearly articulated interest to the contrary. *See id.* at 581, 100 S.Ct. 2814. Such openness is vital as it promotes "public scrutiny of the judicial process, improves the quality of testimony, encourages public respect for the judicial system, and.provides therapeutic value to the community." Colleen E. Michuda, *Defendant Doe's Quest for Anonymity: Is the Hurdle Insurmountable?*, 29 Loy. U. Chi. L.J. 141, 144 (1997).

Still, the presumption of openness in judicial proceedings is not absolute; there are various well-defined and established exceptions.[11] Pertinent here, for instance, is that in certain circumstances it is clear plaintiffs may be permitted to proceed anonymously. Famous examples of such circumstances include *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), where illegal aliens were allowed to proceed anonymously in their successful constitutional challenge to the Texas law denying free public grammar school education to illegal alien children and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), where a pregnant woman was allowed to proceed anonymously in her successful constitutional challenge to a Texas statute criminalizing certain abortions.[12] Other, less familiar examples abound. In *Doe v. A. Corp.*, 709 F.2d 1043, 1044 n. 1 (5th Cir.1983), the Fifth Circuit found that anonymity by both parties was warranted to protect the attorney-client privilege.[13] Similarly, the Fifth Circuit again found anonymity warranted in *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir.1981), to protect a parent and minor plaintiff from the risk of violence if their unpopular opposition to expressions of religious belief in school was made public. And, a district court in *Doe v. United Services Life Ins. Co.*, 123 F.R.D. 437 (S.D.N.Y. 1988), allowed a homosexual plaintiff to proceed anonymously in a suit challenging an insurance company's discriminatory policies against homosexuals.

In the Fourth Circuit, too, it is well-recognized that there are circumstances under which "anonymity may, as a matter of discretion, be permitted." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir.1993). In this regard, the Fourth Circuit has noted that "privacy or confidentiality concerns are sometimes sufficiently critical that parties or witnesses should be allowed this rare dispensation." *Id.* In this connection, the court in the *Jacobson* opinion provided an analytical framework to guide the exercise of a district court's discretion in ruling on anonymity requests. This framework identifies five factors district courts should take into account in assessing anonymity requests:

(1) whether the justification asserted by the requesting party to proceed anonymously is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;

(2) whether identification poses a risk of retaliatory physical or mental harm to

---

**11.** Perhaps the most well known exception, recognized by most states, is the confidentiality and anonymity afforded to parties in juvenile proceedings. *See, e.g.,* Va.Code § 16.1–302 ("The general public shall be excluded from all juvenile court hearings and only such persons admitted as the judge shall deem proper."). Equally familiar is the exception in civil cases allowing a district court to close proceedings and seal court documents in certain circumstances. *See Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir.2000) (upholding the district court's issuance of contempt orders against a reporter and a newspaper for violating a court decree placing a settlement agreement between the parties to a prior case under seal); *In re The Knight Publishing Co.*, 743 F.2d 231, 234 (4th Cir.1984) (upholding the district court's orders closing the courtroom to the public and placing certain court documents under seal in a criminal action against a state senator). Yet another familiar example is the statutory requirement that a complaint filed by a private party in a *qui tam* action remain temporarily under seal. *See* 31 U.S.C. § 3730(b) ("The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.").

**12.** Yet, it should be noted that in neither *Plyler* nor *Roe* does it appear that the issue of anonymity was contested or litigated.

**13.** *See also X Corp. v. Doe*, 816 F.Supp. 1086 (E.D.Va.1993) (permitting defendant in an action for breach of an employee confidentiality agreement to proceed anonymously because defendant was in the process of pursuing a *qui tam* action against his employer).

the requesting party or even more critically, to innocent non-parties;

(3) the ages of the persons whose privacy interests are sought to be protected;

(4) whether the action is against a governmental or private party; and relatedly

(5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* at 238. Importantly, this list of factors is not intended to be exhaustive;[14] the particular facts of a case may suggest the relevance of additional factors.

◼ The first *Jacobson* factor—whether plaintiffs seek to proceed anonymously to "preserve privacy in a matter of sensitive and highly personal nature"—weighs against permitting plaintiffs to proceed anonymously in this case. This is so because unlawful or problematic immigration status is simply not the type of "personal information of the utmost intimacy" that warrants abandoning the presumption of openness in judicial proceedings. *Southern Methodist University Association of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir.1979) (denying plaintiff law students' request to proceed under fictitious names in a suit challenging a law firm's hiring practices under Title VII). Instead, the types of personal intimate information justifying anonymity for litigating parties have typically involved such intimate personal matters as birth control,[15] abortion,[16] homosexuality,[17] or the welfare rights of illegitimate children or abandoned families.[18] *See Wynne & Jaffe*, 599 F.2d at 712–13; *Doe v. Deschamps*, 64 F.R.D. 652, 653 (D.Mont.1974). And, while some of these

plaintiffs may plausibly claim fear of embarrassment from disclosure of their illegal or problematic immigration status, the Tenth Circuit has sensibly held that "[t]he risk that a plaintiff may suffer some embarrassment is not enough" to allow him to proceed anonymously. *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir.2000) (holding that a convicted sex offender challenging Utah's sex offender registration and notification statute could not proceed anonymously, despite plaintiff's desire to prevent disclosure of his sex offender status). In short, a party's immigration status is not "a matter of sensitive and highly personal nature," *Jacobson*, 6 F.3d at 238, such that requiring plaintiffs to reveal their identities would require them to divulge "personal information of the utmost intimacy." *Wynne & Jaffe*, 599 F.2d at 713.

*Wynne & Jaffe*, cited by both parties, is consistent with this result. There, the Fifth Circuit declined to allow women law students to proceed anonymously in a Title VII suit against a law firm despite the plaintiffs' contention that they would have difficulty obtaining law firm jobs were their identities to become known. *See id.* at 713. There, as here, no intimate personal information was involved. Nor are plaintiffs here aided by *dictum* in that case to the effect that plaintiffs allowed to proceed anonymously in other cases "also had to admit that they either had violated state laws or government regulations or wished to engage in prohibited conduct." *Id.* at 713. That *dictum* refers to cases where plaintiffs are allowed to proceed anonymously in challenging the very laws or regulations they have violated or wish to vio-

---

14. *See Jacobson*, 6 F.3d at 238 (listing the five factors after stating *"[a]mong* [the factors] are the following that have relevance to this case" (emphasis added)).

15. *See Poe v. Ullman*, 367 U.S. 497, 500 n. 1, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (stating that the Supreme Court of Errors of Connecticut approved plaintiffs' use of fictitious names in a case involving birth control).

16. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Doe v. General Hosp.*, 434 F.2d 427 (D.C.Cir.1970); *Doe v. Dunbar*, 320 F.Supp. 1297 (D.Colo.1970).

17. *See Doe v. Chafee*, 355 F.Supp. 112 (N.D.Cal. 1973).

18. *See Doe v. Carleson*, 356 F.Supp. 753 (N.D.Cal.1973); *Doe v. Gillman*, 347 F.Supp. 483 (N.D.Iowa 1972); *Doe v. Lavine*, 347 F.Supp. 357 (S.D.N.Y.1972); *Doe v. Swank*, 332 F.Supp. 61 (N.D.Ill.1971), *aff'd sub. nom., Weaver v. Doe*, 404 U.S. 987, 92 S.Ct. 537, 30 L.Ed.2d 539 (1971); *Doe v. Hursh*, 337 F.Supp. 614 (D.Minn. 1970); *Doe v. Shapiro*, 302 F.Supp. 761 (D.Conn. 1969).

late.[19] Such cases are quite different from both this case and *Wynne & Jaffe.* Neither plaintiffs here, nor those in *Wynne & Jaffe,* have sought to proceed anonymously to avoid admitting violating the very laws they challenge; plaintiffs here do not challenge the laws under which their immigration status is illegal or problematic.[20]

Under the second *Jacobson* factor—the risk of retaliation—the Doe plaintiffs argue that they should be permitted to proceed anonymously because otherwise defendants may seek to have them and their families deported. In support, plaintiffs cite a memorandum issued by the Office of the Attorney General of Virginia that urges defendants to report undocumented students to federal authorities. *See* Office of the Virginia Attorney General Memorandum on Immigration Law Compliance at 11 (Sept. 5, 2002). This argument fails because there is no sound reason to believe that disclosure of plaintiffs' identities in this suit increases their chances of being deported. In the first place, the federal government is already aware of each plaintiff's immigration status. Jane Does 1 and 3 are listed as beneficiaries in their parents' applications submitted to the Department of Labor to legalize their immigration status. The federal government is also aware of Jane Doe 2 and her currently legal immigration status, as a result of her successful application for "V" status. Similarly, each of the John Doe plaintiffs and his immigration status is known to the federal government. John Doe 1 is currently an applicant for suspension of deportation and permanent resident status, while John Doe 2 currently enjoys legal TPS status. Thus, of the five individual plaintiffs, all are already known to the federal government, two enjoy legal status in this country and the remaining three are identified applicants for this status. Given this, it is hard to see how revealing their identities as plaintiffs in this case is likely to

lead to their deportation or even to increase their risk of deportation. It is simply not plausible to conclude that making plaintiffs' identities known to these state defendants will necessarily cause defendants to urge the federal government to initiate deportation proceedings against plaintiffs. Equally implausible is the notion that the federal government would heed any such request by the state or have a sufficient interest in plaintiffs' suit challenging a state policy to cause the appropriate federal officials to initiate deportation proceedings. In sum, this factor weighs against anonymity given that the federal government is already aware of each plaintiff and his or her immigration status, and given the absence of any reason to believe that the federal government would seek to deport any plaintiff because he or she is a plaintiff in this suit.

The third *Jacobson* factor—plaintiffs' ages—also weighs against anonymity for most, if not all, plaintiffs. To begin with, three of the five plaintiffs are adults. And, the two minors are on the verge of adulthood and hence do not appear on this record to need the special protections typically reserved for children. *See Doe v. North Carolina Central Univ.,* No. 1:98CV01095, 1999 WL 1939248, at *4 (M.D.N.C. Apr.15, 1999) ("Courts are often more willing to allow parties to proceed anonymously in order to protect the privacy rights of children.") (citing *Jacobson,* 6 F.3d at 241 and *Stegall,* 653 F.2d at 186). There is, moreover, no evidence proffered by John Doe 1, the only minor plaintiff still attending Virginia public high school, that disclosure of his identity would subject him to any abuse or harassment in his school or community environment. Nor is there any reason to suppose that such evidence exists, for it is not unusual for public schools in this district to include large populations of non-citizens, both legal and

---

19. *See, e.g., Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (E.D.Va. 1975) (allowing plaintiffs to proceed anonymously in a case challenging the constitutionality of a state sodomy statute as applied to consensual homosexual activity).

20. Sympathy for illegal immigrants and antipathy toward the country's immigration laws are irrelevant to the decisional calculus in this case. This calculus should yield the same result even if plaintiffs were, say persons who had failed to file and pay federal income taxes or were fugitives from federal arrest warrants and wished to challenge state policies that denied these groups admission to state colleges or driver's licenses.

illegal. In such circumstances, there is little reason to believe that disclosure of this minor's identity as a plaintiff in this matter would subject him to any harassment or abuse.[21]

The fourth *Jacobson* factor—whether the action is against the government versus a private party—does not weigh against anonymity, but is of little significance here. To be sure, courts in general are less likely to grant a plaintiff permission to proceed anonymously when the plaintiff sues a private individual than when the action is against a governmental entity seeking to have a law or regulation declared invalid. *See Wynne & Jaffe*, 599 F.2d at 713 (denying plaintiff's request to proceed anonymously in a suit against a private party). The rationale for this is that the filing of an action challenging the constitutional validity of government activity generally "involves no injury to the Government's 'reputation,'" while an action against a private party can result in damage to the defendant's reputation as well as economic harm. *Id.; see also Doe v. North Carolina Central Univ.*, No. 1:98CV01095, 1999 WL 1939248, at *4 (denying plaintiff's request to proceed anonymously in a suit against a state university because the plaintiff was not seeking to have a law or regulation declared invalid). Although this factor seems to favor plaintiffs' claim for anonymity given that defendants are sued in their official capacities, it is of little significance here. To grant this factor dispositive effect would lead, inappropriately, to granting anonymity to any plaintiff suing the government to challenge a law or regulation.

Like the first three, the fifth *Jacobson* factor—fairness to the defendants—weighs against allowing the plaintiffs to proceed anonymously. While the substantive issues plaintiffs raise do not depend on plaintiffs' identification,[22] an assessment of plaintiffs' standing to litigate these issues clearly does depend on their identity. To establish stand-

ing, a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct...." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (citations omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Thus, to establish their standing to challenge Virginia's alleged policy of denying college admission to illegal aliens, plaintiffs must show that they are or have been adversely impacted by the policy. Thus, plaintiffs here must show that their immigration status is either illegal or problematic such that they have been or are likely to be injured or adversely affected as a consequence of the challenged policy. Defendants, of course, must in fairness be allowed to explore whether plaintiffs have standing, which they can do only if plaintiffs are identified. It may be, for example, that the challenged policy does not extend or is not applied to someone who has "V" immigration status, such as Jane Doe 2, or to someone who has TPS status, such as John Doe 2, in which event, these individuals would not have the requisite standing. Nor do these possibilities exhaust the ways in which defendants may explore and challenge plaintiffs' standing in this case.

Plaintiffs suggest that their request for anonymity can be rendered compatible with defendants' need to explore the facts of standing by the simple expedient of a court order precluding defendants and their counsel from disclosing plaintiffs' identities to the public or the federal government. This suggestion, while not without superficial appeal, is ultimately unpersuasive chiefly for two reasons. First, there is substantial reason to question the propriety of such an order, for, as defendants point out, federal law provides that:

---

**21.** In the Order ruling on the plaintiffs' anonymity request, the minor plaintiffs will be given one final opportunity to disclose any special circumstances that suggest that these plaintiffs' status as minors deserves greater weight in the anonymity calculus.

**22.** Caselaw indicates that any risk of unfairness to a defendant as a consequence of allowing a plaintiff to proceed anonymously is minimized when the "issues raised are purely legal and do not depend on identifying the specific parties." *See Doe v. Alaska*, No. 96–35873, 1997 WL 547941, at *1 (9th Cir. Sept. 2, 1997).

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a).[23] And, given the breadth of this statutory language and its legislative history,[24] the statute's reach arguably extends to federal court decisions. Even so, no court has considered this issue[25] and it remains unclear whether the statute reaches a court's inherent power to control its proceedings including grand jury and national security matters. Second, even assuming the propriety and efficacy of a confidentiality order, it is important to note that use of anonymity does not alter that other factors weigh significantly against anonymity for plaintiffs in this case. In sum, because a confidentiality order is of doubtful propriety and, in any event, would not tip the scales in favor of anonymity, it is not a sound basis for resolving the anonymity question. What is clear is that fairness requires that defendants be allowed to explore and challenge plaintiffs' standing and they can do so effectively only if plaintiffs' identities are disclosed to them.

The final and quite important factor to weigh in this analysis is whether denying plaintiffs' request to proceed anonymously will effectively prevent litigation of the issues presented by discouraging aliens of illegal or questionable immigration status from challenging Virginia's policy in court.[26] While it is important for these issues to be litigated and brought to light, plaintiffs' anonymity request will not, for two reasons, prevent the litigation of these issues. First, these plaintiffs are unlikely to be dissuaded from pursuing this suit even if their identities are disclosed because they know the federal government is already aware of their illegal or problematic immigration status.[27] Nor is it plausible for plaintiffs to fear that the federal government (*i.e.*, the Department of Justice or the Department of Homeland Security) would be hostile to plaintiffs or seek to deport them based on learning that they are plaintiffs in this suit. Indeed,

---

**23.** Moreover, 8 U.S.C. § 1373(b) provides that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from... [s]ending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service." To the same effect, 8 U.S.C. § 1644 provides that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of any alien in the United States."

**24.** The House Conference Report accompanying the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, 110 Stat. 2275, makes clear that Congress intended federal courts to be subject to the requirements of this law. The Conference Report states:

The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, *or decision of any Federal or State court* that prohibits or in any way restricts any communication between State and local officials and the INS.

H.R. Conf. Rep. No. 104–725, at 383 (1996), U.S.Code Cong. & Admin.News 1996, pp. 2183, 2771 (emphasis added).

**25.** The only published decision addressing this statutory provision is *City of New York v. United States*, 179 F.3d 29 (2d Cir.1999), where the City of New York challenged the constitutionality of this provision, which preempted a City executive order, under the Tenth Amendment. The Second Circuit held that the provision did not violate the Tenth Amendment because it did not "directly compel states or localities to require or prohibit anything." *Id.* at 35.

**26.** Although this factor is not listed in *Jacobson*, that opinion makes clear that the five identified factors were not exhaustive. *See supra* note 12.

**27.** *See supra* note 17. The fact that some of the plaintiffs have only made their illegal status known to the Department of Labor and not to the BCIS does not compel a different conclusion on the ground that the USA PATRIOT Act now enables government agencies to share information to a much greater extent than before. *See* USA PATRIOT Act, Pub.L. No. 107–56, 115 Stat. 272, 280 (2001); *see also* Nathan C. Henderson, Note, *The Patriot Act's Impact on the Government's Ability to Conduct Electronic Surveillance of Ongoing Domestic Communications*, 52 Duke L.J. 179, 204–205 (2002).

**396**

plaintiffs have adduced no reason to believe (nor does any appear) that the federal government has a view or position on the issues raised in this case. It seems as reasonable as not to conclude that the federal government either favors plaintiffs' positions on the issues in this case or has no interest in those issues or in Virginia's college admissions policies. Second, the United States Citizenship and Immigration Services reports that in 2000 there were an estimated 7.0 million illegal aliens in the United States, including 103,000 in Virginia, a not insubstantial proportion of whom are doubtless of school and college age.[28] Thus, even if the five plaintiffs at issue here might be discouraged from bringing this suit if required to disclose their identities, at least one of these many eligible illegal aliens in Virginia would likely be willing to bring suit and reveal her identity.

### III.

In sum, all of the *Jacobson* factors, but the fourth, weigh against permitting plaintiffs to proceed anonymously. And, the fourth factor alone is of little significance here and falls far short of rebutting the general presumption of openness in judicial proceedings. *See Richmond Newspapers, Inc.,* 448 U.S. at 573, 100 S.Ct. 2814. Indeed, to conclude otherwise would effectively grant anonymity to all plaintiffs suing the government to challenge a law or regulation. Such a result runs counter to the principle that the grant of an anonymity request is a "rare dispensation" reserved for particularly critical privacy or confidentiality concerns. *Jacobson,* 6 F.3d at 238. This case is not a fit occasion for this "rare dispensation."

Accordingly, plaintiffs' motion for order to proceed by fictitious names must be denied.

An appropriate order will issue.

**28.** *See* United States Citizenship and Immigration Services, United States Department of Homeland Security, *2002 Yearbook of Immigration Statistics, Estimates of Unauthorized Immigrants, available at* http://uscis. gov/graphics/shared/aboutus/statistics/illegal2002.pdf.