**Jane DOE, Plaintiff,**

v.

**PITTSYLVANIA COUNTY, VIRGINIA and Board of Supervisors of Pittsylvania County, Virginia, Defendants.**

**Civil Action No. 4:11cv00043.**

United States District Court,
W.D. Virginia,
Danville Division.

Feb. 3, 2012.

Frank Morris Feibelman, Law Office of Frank Feibelman, Richmond, VA, Rebecca Kim Glenberg, Thomas Okuda Fitzpatrick, ACLU of Virginia, Richmond, VA, for Plaintiff.

William Martin Stanley, Jr., Stanley & Stanley LLC, Moneta, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL F. URBANSKI, District Judge.

This lawsuit challenges the practice of the Board of Supervisors of Pittsylvania County, Virginia of regularly opening its meetings with Christian prayer.[1] This matter is currently before the court on plaintiff's Motion for Leave to Proceed Using Pseudonyms and for Protective Order (Dkt. # 3). A hearing was held on various pending motions in this case on December 9, 2011. Prior to the hearing, the court conferred with counsel in chambers and determined not to hear argument on the instant motion in open court, given the nature of the issues involved and the evidence filed under seal, and in light of the extensive briefing by the parties. In lieu of argument, the court gave the parties fourteen (14) days to file any additional evidence or briefs in support of their respective positions on the anonymity issue. Both parties submitted supplemental briefs. The court has reviewed all of the materials filed, considered carefully the arguments raised, and examined the relevant case law. This matter is now ripe for adjudication. For the reasons set forth herein, plaintiff's Motion for Leave to Proceed Using Pseudonyms and for Protective Order (Dkt. # 3) is **DENIED**.

### I.[2]

██ The ultimate test for deciding if a plaintiff should proceed anonymously is whether plaintiff "has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir.1992) (quoting *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. Unit A 1981)). This presumption of openness is firmly rooted in our nation's law. *Doe 1 v. Merten*, 219 F.R.D. 387, 390 (E.D.Va.2004). Courts have long held that the First Amendment protections of freedom of speech and press safeguard the public's right to attend trials, which must be "open to the public absent an overriding and clearly articulated interest to the contrary." *Id.* at 390–91 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)). Indeed, anonymity is not contemplated by the Federal Rules of Civil Procedure. Rule 10(a) provides that "[t]he title of the complaint must name all the parties." The intent is to "'apprise the parties of their opponents and to protect the public's legitimate interest in knowing all the facts and events surrounding court proceedings.'" *Doe v. Hallock*, 119 F.R.D. 640, 643 n. 1 (S.D.Miss.1987) (quoting *Free Market Comp. v. Commodity Exch., Inc.*, 98 F.R.D. 311, 312 (S.D.N.Y.1983)); *Doe v. Rostker*, 89 F.R.D. 158, 160 (N.D.Cal.

---

1. Defendant Board of Supervisors of Pittsylvania County is the governing body of defendant Pittsylvania County, Virginia. Defendants are hereinafter collectively referred to as "the Board."

2. The facts of this case are set forth in full in the Memorandum Opinion on defendants' motion to dismiss filed contemporaneously with this opinion. Those facts are incorporated herein by reference. Thus, this opinion proceeds directly to consider the instant motion.

1981). Public access to a plaintiff's name "is more than a customary procedural formality; First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings." *Stegall*, 653 F.2d at 185 (citing *Richmond Newspapers*, 448 U.S. 555, 100 S.Ct. 2814).

◼ The presumption of openness is not absolute, however. In some limited circumstances, anonymity may be appropriate. The crucial interests served by open judicial proceedings are not compromised by allowing a party to proceed anonymously. *Stegall*, 653 F.2d at 185. If a plaintiff is granted leave to proceed using a fictitious name, the public is not denied its right to attend the proceedings or inspect the orders or opinions of the court on the underlying constitutional issue. *Doe v. Barrow Co.*, 219 F.R.D. 189, 193 (N.D.Ga. 2003); *see also Stegall*, 653 F.2d at 185. "[T]he only thing potentially being shielded from the public is plaintiff's name and any court proceedings or opinions that might be necessary to determine standing." *Barrow Co.*, 219 F.R.D. at 193.

◼ Still, it is the exceptional case in which a court allows a party to proceed anonymously. *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir.1993) (allowing a party to proceed anonymously is a "rare dispensation"); *see also Raiser v. BYU*, 127 Fed. Appx. 409, 410–11 (10th Cir.2005) (use of pseudonyms allowed in exceptional circumstances); *MM. v. Zavaras*, 139 F.3d 798, 800 (10th Cir.1998) ("There are a number of cases which recognize that identifying a party only by a pseudonym is an unusual procedure."); *Southern Methodist Univ. Assoc. v. Wynne & Jaffe*, 599 F.2d 707, 712 (5th Cir.1979) (courts allow plaintiffs to use fictitious names in certain special circumstances); *Frank*, 951 F.2d at 323 ("It is the exceptional case in which a plaintiff may proceed under a fictitious name."); *Roe v. Heil*, No. 11–cv–01983–WJM–KLM, 2011 WL 3924962, at *1 (D.Colo. Sept. 7,

2011) (" 'Proceeding under a pseudonym in federal court is, by all accounts, an unusual procedure.' " (quoting *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir.2000))); *Does 1–114 v. Shalushi*, No. 10–11837, 2010 WL 3037789, at *1 (E.D.Mich. July 30, 2010) ("[P]rivacy in one's identity in a public forum-such as a federal court-is the exception, not the rule."); *Freedom From Religion Found. v. Cherry Creek Sch. Dist.*, No. 07–cv–02126–MSK, 2009 WL 2176624, at *5 (D.Colo. July 22, 2009) ("While case law recognizes that Rule 10(a) should not be applied inflexibly, identifying a plaintiff only by a pseudonym is an 'unusual practice.' " (quoting *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir.1979))).

◼ Party anonymity is a discretionary determination made by the trial court. *See James v. Jacobson*, 6 F.3d 233, 242 (4th Cir.1993). In *James*, the Fourth Circuit Court of Appeals outlined five factors to be considered by courts grappling with anonymity requests: (1) whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; (3) the ages of the persons whose privacy interests are sought to be protected; (4) whether the action is against a governmental or private party; and (5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously. 6 F.3d at 238. These factors are not exhaustive; other factors may be relevant depending on the specific circumstances of a case. *See id.* (noting these five factors, which were relevant to that particular case, were among those to be considered); *see also Merten*,

219 F.R.D. at 392 ("Importantly, this list of factors [in *James* ] is not intended to be exhaustive; the particular facts of a case may suggest the relevance of additional factors." (footnote omitted)). The court must "carefully review *all* the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." *Frank,* 951 F.2d at 323 (citing *Wynne & Jaffe,* 599 F.2d at 713); *see also Barrow Co.,* 219 F.R.D. at 193.

## II.

Four of the five factors identified by the Fourth Circuit in *James* can be dealt with rather concisely in the context of this particular case and are discussed below. *See* §§ II. A., C, D., & E., *infra.* The other factor outlined in *James* is set forth in a separate Appendix to this Memorandum Opinion for reasons explained below. See § II. B., *infra.*

### A.

■■ The first *James* factor requires the court to consider whether Jane Doe has identified "a specific sensitive and personal privacy interest," *Yacovelli v. Moeser,* No. 1:02CV596, 2004 WL 1144183, at *6 (M.D.N.C. May 20, 2004), or whether she merely seeks to "avoid the annoyance and criticism" that comes with litigation. *James,* 6 F.3d at 238. Indeed, some citizens of Pittsylvania County have voiced criticism of this lawsuit in a very public manner, and it is likely that such criticism will continue as this case progresses. Certainly, on some level, plaintiff seeks to shield herself from opposition to and disapproval of her position in this case, as expressed by certain members of her community. See discussion, *infra,* § III. But it is also true that plaintiff has a specific privacy interest at stake. Religion lies at the heart of this case, and religion is a "quintessentially private matter." *Stegall,*

653 F.2d at 186; *accord Yacovelli,* 2004 WL 1144183, at *6; *Barrow Co.,* 219 F.R.D. at 193; *see also Engel v. Vitale,* 370 U.S. 421, 431–32, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) ("[R]eligion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate."). While plaintiff's particular religious beliefs are not determinative of the constitutional question to be decided here, prosecution of this case will require plaintiff to reveal her "beliefs concerning the proper interaction between government and religion," which concerns can "implicate privacy matters similar to those associated with actual religious teachings and beliefs." *Barrow Co.,* 219 F.R.D. at 193. As such, the first *James* factor weighs in plaintiff's favor.

### B.

The second factor articulated by the Fourth Circuit in *James* is whether identification poses a risk of retaliatory physical or mental harm to plaintiff or to innocent non-parties. This factor requires a more in depth analysis and is therefore set forth in a separate section of this opinion. *See* § III, *infra.* Given the identifying nature of the evidence presented on the issue of harm, this portion of the analysis will be filed in an Appendix to this Memorandum Opinion, which will be placed under seal until further Order of the court.

### C.

■ The third *James* factor concerns the ages of the persons whose privacy interests are sought to be protected. Plaintiff is not a minor and does not possess the "special vulnerability" of a child-plaintiff. *Stegall,* 653 F.2d at 186. This factor weighs decidedly against anonymity. *See id.* (finding especially persuasive the fact that plaintiffs are children); *Yacovelli,* 2004 WL 1144183, at *8 (in case involving college students where one plaintiff was a minor at the time of filing but had since reached the age of majority, court held

factor cut both ways since "college students may still possess the immaturity of adolescence"); *Merten*, 219 F.R.D. at 393 (factor weighed against anonymity where three of five plaintiffs were adults and the two minors were "on the verge of adulthood"); *Doe v. North Carolina Cent. Univ.*, No. 1:98CV01095, 1999 WL 1939248, at *4 (M.D.N.C. Apr. 15, 1999) ("Courts are often more willing to allow parties to proceed anonymously in order to protect the privacy rights of children."); *Doe v. Sante Fe Indep. Sch. Dist.*, 933 F.Supp. 647, 651–52 (S.D.Tex.1996) (protecting the anonymity of the minor plaintiffs, but not the adult plaintiffs, and noting, "[a]dults are simply not as vulnerable as schoolchildren to social and physical intimidation or violence").

### D.

 The fourth factor to be considered is whether the action is against a governmental or private party. "[C]ourts in general are less likely to grant a plaintiff permission to proceed anonymously when the plaintiff sues a private individual than when the action is against a governmental entity seeking to have a law or regulation declared invalid." *Merten*, 219 F.R.D. at 394 (citing *Wynne & Jaffe*, 599 F.2d at 713). Actions against the government do no harm to its reputation, whereas suits filed against private parties may damage their good names and result in economic harm. *Wynne & Jaffe*, 599 F.2d at 713. Thus, it is a matter of "[b]asic fairness" that a private-party defendant's accusers participate in the suit under their real names. *Id.*

 But the reverse is not necessarily true. The simple fact that plaintiff sues a governmental entity does not give the

court more reason to grant her request for anonymity.[3] "[O]f course, in only a very few cases challenging governmental activity can anonymity be justified." *Stegall*, 653 F.2d at 186. The fact that plaintiff sued her local government, as opposed to a private individual, is something to be considered by the court. However, this factor must be viewed in the context of *Wynne & Jaffe*, 599 F.2d 707, the case in which it was first articulated. *Frank*, 951 F.2d at 323.

In *Wynne & Jaffe*, four female lawyers sought to proceed anonymously in a Title VII case against two Dallas law firms. Noting most cases in which plaintiffs were allowed to proceed anonymously involved actions challenging government activity, the court distinguished the Title VII case because "[d]efendant law firms stand publicly accused of serious violations of federal law. Basic fairness dictates that those among the defendants' accusers who wish to participate in this suit as individual party plaintiffs must do so under their real names." 599 F.2d at 713. As the Eleventh Circuit concluded in *Doe v. Frank*:

> Thus, because the plaintiffs were suing private individuals rather than a government agency, the court found *more* reason *not* to grant the plaintiffs' request for anonymity. *Wynne & Jaffe* does not stand, however, for the proposition that there is more reason to grant a plaintiff's request for anonymity if the plaintiff is suing the government. Consequently, the fact that Doe is suing the Postal Service does not weigh in favor of granting Doe's request for anonymity.

951 F.2d at 324.

Nothing in the Fourth Circuit's *James* opinion is inconsistent with this conclusion. The Fourth Circuit listed this factor as one

---

**3.** *See Doe v. Megless*, 654 F.3d 404, 410 (3d Cir.2011) (finding public interest in knowing plaintiff's identity is heightened " 'because Defendants are public officials and govern-

ment bodies' " (quoting *Doe v. Megless*, No. 10–1008, 2010 WL 3076246, at *4 (E.D.Pa. Aug. 5, 2010))).

to be considered by courts weighing anonymity requests, noting specifically that it was relevant to the *James* case. 6 F.3d at 238. And *James*, like *Wynne & Jaffe*, involved a private-party defendant, not a governmental entity. There is no suggestion in *James* that a trial court has more reason to grant an anonymity request if the defendant is a governmental entity. It may well be that "courts are more like[ly] to permit plaintiffs to proceed under a pseudonym" when a plaintiff challenges the government rather than a private individual. *Yacovelli*, 2004 WL 1144183, at *8. But at least one district court within this circuit has declined to give this factor dispositive effect, for to do so "would lead, inappropriately, to granting anonymity to any plaintiff suing the government to challenge a law or regulation." *Merten*, 219 F.R.D. at 394.

Viewing this factor in the context of both *Wynne & Jaffe* and *James*, the court gives it neutral weight.

### E.

■ Because there is little risk to the Board in allowing plaintiff to proceed anonymously, the fifth *James* factor weighs in plaintiff's favor. The Board argues that plaintiff's identity is germane to this litigation because it must be able to cross-examine plaintiff on her motivations for bringing this lawsuit in order to disprove actual injury. The Board takes the position that plaintiff has not been injured by its routinely Christian prayer, but rather that she brings this suit in retaliation against the Board.

■ However, plaintiff's motivations for bringing this lawsuit are inapposite.[4] As long as she has standing to sue,[5] this case revolves around a single legal issue-whether the Board's practice of regularly opening its meetings with Christian prayer violates the United States Constitution. *See Barrow Co.*, 219 F.R.D. at 193. "Case law indicates that any risk of unfairness to a defendant as a consequence of allowing a plaintiff to proceed anonymously is minimized when the 'issues raised are purely legal and do not depend on identifying the specific parties.'" *Merten*, 219 F.R.D. at 394 n. 22 (citing *Doe v. Alaska*, No. 96–35873, 1997 WL 547941, at *1 (9th Cir. Sept. 2, 1997)). This is not a case that turns on plaintiff's credibility. *Barrow Co.*, 219 F.R.D. at 194. Indeed, "[a]t the end of the day, plaintiff plays a relatively minor role in this litigation," *id.*, and the risk of unfairness to defendants by allowing plaintiff to proceed anonymously is relatively low.[6] As such, this fifth factor weighs in plaintiff's favor.

*[ Sections III., IV., and V. of this Memorandum Opinion are set forth in the accompanying Appendix]*

### VI.

For the reasons set forth above and in the accompanying Appendix, plaintiff's

---

4. The court notes that one of the factors bearing on anonymity articulated by the Third Circuit is "whether the party seeking to sue pseudonymously has illegitimate ulterior motives." *Megless*, 654 F.3d at 409. The Board's claim that the filing of this suit was retaliatory, if true, indeed could be considered an ulterior motive and perhaps have some relevance to this analysis. But the Board does not develop this argument in its briefs and offers no evidence to support this contention. As such, the court cannot give this factor any significant weight.

5. Plaintiff's standing to bring this action is addressed in the Memorandum Opinion on defendants' motion to dismiss filed contemporaneously herewith.

6. It is also worth noting that the Board is already aware of plaintiff's identity, further diminishing any risk of unfairness to the Board should plaintiff be permitted to proceed anonymously.

Motion for Leave to Proceed Using Pseudonyms and for Protective Order (Dkt. # 3) is **DENIED.**

While citizens of Pittsylvania County and members of the community at large are free to express their opinions on this case, **threatening or intimidating acts directed against anyone involved in this lawsuit will not be tolerated or condoned by inaction.** Individuals that become aware of such conduct should immediately notify the court or the United States Attorney for the Western District of Virginia.

As set forth in the accompanying Order, this case shall remain styled under the name of Jane Doe for thirty (30) days to allow plaintiff an opportunity to appeal the court's ruling on anonymity and/or determine whether she wishes to continue with this action under her actual name. *See James,* 6 F.3d at 238 (order denying plaintiffs' motion to proceed anonymously is appealable under the collateral order doctrine). After thirty (30) days has expired, if no appeal has been noted on the anonymity issue and if plaintiff intends to proceed, she must apprise the Clerk of her actual name and the Clerk shall style this case in plaintiff's actual name. At that time, the court will enter a separate Order unsealing the Appendix to this Memorandum Opinion.[7]

## APPENDIX

### TO THE MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR LEAVE TO PROCEED USING PSEUDONYMS AND FOR PROTECTIVE ORDER

### III.

 The second factor outlined by the Fourth Circuit Court of Appeals in *James v. Jacobson* requires the court to consider "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties." 6 F.3d 233, 238 (4th Cir.1993). Courts evaluating this factor place particular importance on the retaliatory nature of any threatened harm. *See, e.g., Nelson v. Green,* No. 3:06cv70, 2007 WL 984127, at *2 (W.D.Va. Mar. 28, 2007) (finding this factor did not favor anonymity where identification of plaintiff "could conceivably pose a risk of future mental harm, [but] that harm would not be 'retaliatory' in nature"); *Qualls v. Rumsfeld,* 228 F.R.D. 8, 12 (D.D.C.2005) ("None of the evidence demonstrates that Doe plaintiffs are likely to face physical retaliation as a result of filing this lawsuit; therefore, they cannot proceed under pseudonyms."); *Yacovelli v. Moeser,* No. 1:02cv596, 2004 WL 1144183, at *7 (M.D.N.C. May 20, 2004) ("[E]mbarrassment and harassment are generally insufficient to demonstrate retaliatory harm."); *Doe v. North Carolina Cent. Univ.,* No. 1:98cv01095, 1999 WL 1939248, at *3 (M.D.N.C. Apr. 15, 1999) (notwithstanding affidavit from plaintiff's psychologist stating she will suffer emotional distress if identified, plaintiff did "not allege any potential retaliation or harassment if her name is released in court documents"); *see also Does I–XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1071 (9th Cir.2000) (holding plaintiffs need not prove they face a danger of physical injury when they face extraordinary retaliation such as deportation, arrest, and imprisonment); *Doe v. Stegall,* 653 F.2d 180, 186 (5th Cir. Unit A Aug.1981) ("Evidence on the record indicates that the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed...."); *Doe v. Shakur,* 164 F.R.D.

---

7. The Order also will direct the Clerk to unseal the parties' filings as to the issue of anonymity, Dkt. #s 16, 22, 26, 32, 33, and 37.

359, 362 (S.D.N.Y.1996) ("Plaintiff's allegation that she has been subjected to death threats would provide a legitimate basis for allowing her to proceed anonymously."); *Doe v. First Nat'l Bank of Chicago,* 668 F.Supp. 1110, 1111 (N.D.Ill.1987) (permitting parties to proceed pseudonymously after they became targets of threats and harassment). Fear of humiliation and embarrassment or the threat of economic harm, standing alone, is not a sufficient reason to grant a motion to proceed pseudonymously. *See Doe v. Frank,* 951 F.2d 320, 324 (11th Cir.1992); *Qualls,* 228 F.R.D. at 12; *Shakur,* 164 F.R.D. at 362.

In the instant case, plaintiff fears "that if [her] involvement were made public, [she] would experience social ostracism, harassment or threats from community members." Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 5. Specifically, she asserts that she would be subject to the same hostility expressed by members of the community on online discussion pages and in emails sent to her counsel, the American Civil Liberties Union of Virginia Foundation, Inc. ("ACLU"). *Id.* at ¶ 6. While the court is mindful of plaintiff's concerns, the evidence presented does not establish that plaintiff will be subject to retaliatory harm should her identity be revealed, and thus does not tip the scales in favor of anonymity.

### A.

As evidence of her risk of retaliatory harm, plaintiff first points to the "alarming history of violence and threats of violence against Establishment Clause plaintiffs." Mem. in Support of Pl.'s Mot. for Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Br."), Dkt. # 4, at 3. Plaintiff cites a number of cases dating as far back as 1945 in which Establishment Clause plaintiffs have faced harassment, retaliation, and physical violence. *Id.* But plaintiff's general fears of

retaliation do not persuade the court of the need for pseudonymous litigation in this case. *See Freedom From Religion Found., Inc. v. Cherry Creek Sch. Dist.,* No. 07–cv–02126–MSK, 2009 WL 2176624, at \*5–6 (D.Colo. July 22, 2009) (where plaintiff cited three anecdotal accounts of religious discrimination and harassment from a book, the court held "the unsubstantiated potential for an adverse public reaction does not establish a compelling reason to depart from the requirements of Rule 10(a)"); *Doe # 1 v. Von Eschenbach,* No. 06–2131, 2007 WL 1848013, at \*2 (D.D.C. June 27, 2007) (declining to grant an anonymity request where plaintiff's fears of retaliation were vague and unsubstantiated); *Qualls,* 228 F.R.D. at 12 (unsubstantiated and vague concerns did not show likelihood of retaliation). Courts have rejected "this type of 'it has happened before, therefore it *might* happen here' argument" as being insufficient to justify a protective order cloaking plaintiff in anonymity. *Doe v. Beaumont Indep. Sch. Dist.,* 172 F.R.D. 215, 217 (E.D.Tex. 1997).

Indeed, some Establishment Clause plaintiffs in the past have been the victims of harassment and even violence at the hands of disapproving community members. But not every Establishment Clause plaintiff proceeding without a pseudonym is subjected to harassment and violence. Merely citing some instances in which Establishment Clause plaintiffs have been victims of retaliatory conduct does not establish a risk of retaliatory harm for this particular plaintiff in these particular circumstances. *See Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* No. 08–00359, 2008 WL 4755674, at \*4 (D.Haw. Oct. 28, 2008) (finding news articles about physical attacks based on race, sex and disability "were not connected to any of the parties in this action, nor do they

involve threats against anyone challenging Defendants' admissions policy"); *see also Qualls*, 228 F.R.D. at 12 ("None of the evidence demonstrates that Doe plaintiffs are likely to face physical retaliation as a result of filing this lawsuit; therefore, they cannot proceed under pseudonyms."). The historical treatment of Establishment Clause plaintiffs does not convince the court that a protective order is warranted in this case. However, it may serve as a backdrop against which the court views any threats directed toward this plaintiff. With that in mind, the court turns to the evidence plaintiff claims supports her fear of retaliatory conduct.

### B.

Plaintiff claims that she has been "alarmed by the virulent reactions of members of the community to the controversy surrounding sectarian prayers at Board of Supervisors meetings" and fears that she "would be subject to the same hostility" if people learned she is involved in this litigation. Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 6. The evidence of record supporting plaintiff's fear of "hostility" from Pittsylvania County residents consists of: (1) telephone calls and emails to her counsel; (2) letters to the editor of the local newspaper; (3) an August 18, 2011 newspaper article; (4) postings by internet subscribers on on-line discussions boards; and (5) a comment made to her about "Jew speak" at the September 6, 2011 Board meeting.[8] As detailed below, none of this evidence persuades the court that plaintiff is at risk of retaliatory harm.

### 1.

Plaintiff first points to a series of emails and telephone calls to her counsel, the ACLU, that she claims are representative of the kind of "public opprobrium" that will be directed at plaintiff should her identity be disclosed. Pl.'s Br., Dkt. # 4, at 9. One such caller said ACLU legal director Rebecca Glenberg was going to "burn in hell" for opposing Christian prayer. Decl. of Valerie Jones–Fleming, Dkt. # 4, at Ex. 3 ¶ 2. Another said Glenberg should be "fired and 'put in the dump.'" *Id.* An email sent to the ACLU stated, "If you don't like prayer leave Virginia you bunch of jerks. I'm sick [of] you the aclu sticking thier [sic] noses where it does not belong. I bet if members wore id's saying they were with the aclu daily beating would be given to them." Pl.'s Br., Dkt. # 4, at Ex. 4. Another email correspondent said, "You cater to about 15% of the people that don't know how to pour pee out of a boot with the directions on the heel, and dont' [sic] listen to the 85% majority. Come on people, it [is] time to wake up and smell the roses before groups like you ruin the country even more than it already is.... I am offended by your actions on this prayer issue on [sic] the Board of Supervisiors [sic] in Pittsylvania Co. and I want to know what you plan to do about it." Pl.'s Br., Dkt. # 4, at Ex. 5.

These phone calls and emails[9] do not show plaintiff is at risk of retaliation. For one thing, none of the sentiments expressed above is directed at plaintiff. Rather, these criticisms are aimed at the ACLU, a high-profile national civil rights organization. The ACLU's work in the civil rights field transcends its involvement in this case. Plaintiff argues that should her identity be made public, "she will attract at least as much venom" as the

---

8. *See* Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 7.

9. Both emails were sent from accounts bearing what the court assumes is the author's

name. The phone calls, however, appear to have been made anonymously.

ACLU has in this case. Suppl. Mem. In Support of Mot. For Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Suppl. Br."), Dkt. # 32, at 1 n.1. But as discussed, *infra,* plaintiff's identity is already known to some, certainly to defendants, and there is no evidence that she has received similar calls or emails since she first asked the Board to cease its Christian prayer practice, prior to filing suit. Even if the communications referenced above had been directed at plaintiff instead of the ACLU, the fact remains that none of them is threatening. "While unpleasant and disturbing to the persons receiving them," *Yacovelli v. Moeser,* No. 1:02cv596, 2004 WL 1144183, at *7(M.D.N.C. May 20, 2004), these phone calls and emails simply do not threaten retaliatory harm to plaintiff. In *Yacovelli,* plaintiffs introduced as evidence several emails they claimed were threatening. One email stated "you people suck a* *. Why don't you all pack yourselves into a boat, go out into the middle of the ocean, and then set it on fire." *Id.* Another stated "may evolution make quick work of you and pople [sic] who think like you . . . ." *Id.* Unlike in the instant case, these sentiments appear to have been directed at the *Yacovelli* plaintiffs themselves.[10] Nevertheless, the court found that they did not threaten physical harm and held the second *James* factor tipped slightly in favor of the defendants. The same is true here. To be sure, the emails and phone calls to the ACLU are distasteful and offensive. But they do not estab-

lish that plaintiff is at risk of retaliatory harm.

### ·2.

Plaintiff next points to six letters to the editor of the *Danville Register and Bee* published on August 30, 2011 and September 1, 2011. Plaintiff claims these letters are indicative of the tone of public commentary about this case. Pl.'s Br., Dkt. # 4, at Ex. 6–7. And that may well be true. But once again, the opinions expressed in these letters are directed at the ACLU, not at plaintiff. The authors voice their frustration with the ACLU generally, stating things such as, "If there was ever a group of lawyers that needs to be run out of this country, it's the ACLU. It all depends on who you are and what you say whether you have a right to say it or not. They have done more damage to this country than any group." *Id.* at Ex. 7. Another writer stated that by litigating cases such as this one, the ACLU is "trying to justify the jobs of hundreds of attorneys; they don't give a hoot about what happens in your life as long as the checks keep coming." *Id.* at Ex. 6. The authors also voice their opinions on issues such as religion's role in government, the intent of the Framers in drafting the Establishment Clause, and whether the stand taken by the Board in this case is the correct one. *Id.* at Ex. 6–7. "Lawsuits involving religion can implicate deeply held beliefs and provoke intense emotional responses." *Doe ex rel. Doe v. Elmbrook Sch. Dist.,* 658 F.3d 710, 723 (7th Cir.), *reh'g en banc granted* (Nov. 17, 2011).[11] That is clearly

---

10. This is not entirely clear from the face of the court's opinion, which states only that "Plaintiffs identify several allegedly threatening e-mails." 2004 WL 1144183, at *7. However, because the *Yacovelli* court goes on to find these emails "do not specifically threaten physical harm to the Plaintiffs" and separately analyzes emails sent to the Family Policy Network criticizing supporters of the plain-

tiffs' cause, it appears to this court that the "several allegedly threatening e-mails" referred to by the *Yacovelli* court had been directed at the *Yacovelli* plaintiffs.

11. The Seventh Circuit's opinion affirming the district court's judgment that the school district's use of rented church space for graduation ceremonies did not violate the Estab-

what we see here. These writers urge readers of the *Danville Register and Bee* to "stand up for our religious rights guaranteed us by our Constitution" and to come to the September 6, 2011 Board of Supervisors meeting to support the Board. Pl.'s Br., Dkt. # 4, at Ex. 6–7. They do not harass or threaten harm in any respect. These letters, all signed by the authors, merely express six local citizens' opinions on the subject matter at hand. They are not probative of plaintiff's risk of retaliatory harm in this case.

### 3.

The same goes for the August 18, 2011 article published in the *Lynchburg News & Advance*, Pl.'s Br., Dkt. # 4, at Ex. 9. This article discusses the growing support for the Board's position on the issue of Christian prayer. The two individuals interviewed for the article-one, a long-time host of a local religious radio show and the other a local attorney-both voiced opposition to the position taken by the ACLU. The Rev. R.J. "Brother Bob" Barber, host of "Tabernacle Time," stated he planned to lead a rally at the next Board meeting and urged "everyone in agreement with the board to stand up for 'our God-given' rights." *Id.* Barber expressed his view that "everyone should have the right to pray to their god," including, by implication, the Christian members of the Board and meeting attendees. *Id.* Attorney Ronald Williams stated he is "indignant and upset" at the ACLU's position in this case and referred to it as "idiotic" and "an assault by the devil." *Id.* The 74–year old Williams offered to represent the Board should the matter be brought into court and said "he is ready for battle" and "wants to go down fighting"[12] in his last

years as a lawyer. *Id.* This article in no way establishes that plaintiff is at risk of retaliatory harm as a result of this litigation.

### 4.

Likewise, online commentary to an August 19, 2011 *Danville Register and Bee* article entitled *ACLU ponders lawsuit over Pittsylvania prayer,* does not create a risk of retaliatory harm. Plaintiff proffers as evidence a selection of comments posted by internet subscribers to this article and the responses to those comments. All of this commentary is associated with the individual internet subscriber's name. None of the comments mentions plaintiff. The ACLU is once again the topic of discussion as commenters proclaim that "the aclu should simply stay the he! [sic] out of danville," that "[t]he American people need to rise up and dissemble [sic] the ACLU ... they have been a thorn in our side for way too long ... They are our enemy ...," and that "[t]he aclu can do what ever it wants to but when judgement [sic] day come [sic] they have to answer to our LORD Jesus Christ. He says that the ones that don't beleve [sic] in him shall go in the PIT!!!!!!!!" Pl.'s Br., Dkt. # 4, at Ex. 8. Some commenters champion their beliefs that "[w]hen the ACLU and our out of control judges prevent prayer, they are violating the 1st amendment big time...." *Id.* Others maintain that the Board is violating the law by promoting one religion over others and should be keeping business and personal beliefs separate. *Id.* These commenters share their various interpretations of the First Amendment and reference their own religious convictions. But they do not threaten plaintiff.

---

lishment Clause was vacated pending rehearing en banc. A rehearing is scheduled for February 9, 2012.

**12.** By "go down fighting," it is clear that Williams refers to a legal battle.

The online comments posted in response to the September 26, 2011 article in the *Danville Register and Bee* entitled *ACLU sues Pittsylvania County over prayer* do mention plaintiff but again contain no threats. The relevant discussion reads as follows:

> *CM:*[13] people will do anything for money ... just hope this person that was soooo offended is smart enough not to make himself known ... it would not be a good thing I'm sure ... just saying karma don't know God either.
>
> *CM:* im offended that some spineless worm hiding behind the ACLU is offended ... therefor [sic] im thinking i need counsel to sue them to get Danville's tax dollars back ... just saying
>
> *BH:* That's very Christian of you.
>
> *DD:* Hey [CM]Maybe we could sue the ACLU and this coward because we are offended that they are offended!!
>
> *CM:* [DD] thats what im thinking ... i figure if the worm can find someone to sue on his behalf why cant we chances are this individual isnt even from these parts or owes a lot of money for alimony or back child support lol
>
> *KBM:* I think some of the posts have illustrated why there is a "Jane Doe" filing. It is sometimes hard to determine what is an idle threat and those to be taken seriously. Also, the filing was in Pittsylvania County, not Danville.
>
> *CM:* [KBM] i dont think violence is ever an answer however i do believe that its worth checking into suing whomever it is for offending taxpayers wallets
>
> *DP:* [CM]—I agree. I don't think violence is even an issue here. If that is her stand on this issue then that is her

stand. Just think it is very cowardly to sue a county and not have the guts to come forward.

> *CM:* [DD] yep yep ... well if she can sue the county then next its the president cuz [sic] i hear he is saying his prayers too ... just saying
>
> *BH:* Yes, she could IF the president said a Christian prayer. Which he's not going to, by the way. He'll mention "God", but not a specific god. That's what the ACLU is pushing for ... a non-sectarian prayer.
>
> *SM:* did you not read they were suing for court costs only? the BOS is breaking the law. they are wasting our tax dollars on an issue that has a ton of case law behind it. FIRE the BOS!

Pl.'s Reply Mem. in Support of Mot. for Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Pl.'s Reply Br."), Dkt. # 22, at Ex. 3.

There are a number of things to note about this colloquy. First, there is no mention of any retaliatory harm that may be inflicted upon plaintiff. In fact, the commenters who refer to plaintiff as a "coward" and a "spineless worm" both make affirmative statements of non-violence, dispelling any notion that their feelings towards plaintiff and this case could manifest themselves in the form of physical violence. Secondly, it is important to note that these comments represent only some of the postings on this online discussion board. This is not the entire universe of online commentary posted in reaction to media coverage of this lawsuit.[14] Without knowing how much online discussion there is on the subject and what the postings say, there is simply no way to tell how

---

**13.** Commenters are referred to herein by their initials.

**14.** Indeed, it is clear from the face of Exhibit 8 to plaintiff's brief (Dkt.# 4) that this exhibit does not contain all of the comments and responses posted. Exhibit 8 shows there are at least 20 other responses to various comments hidden from view on the page.

representative these comments are of the alleged "public opprobrium" plaintiff fears may be directed at her.

It is also worth noting that the *Danville Register and Bee's* coverage of this lawsuit has stirred online debate among members of the community on both sides of the issue. Even the limited sample of online commentary provided by plaintiff proves that the public reaction to this litigation is not one-sided. Immediately following the series of comments referring to plaintiff as a "coward" is a commenter's view that "[t]he BOS is breaking the law ... [and] wasting our tax dollars ... FIRE the BOS!" Pl.'s Reply Br., Dkt. # 22, at Ex. 3. This online chatter is precisely the type of "overheated rhetoric common to passionate debate about significant social issues...." *Elmbrook Sch. Dist.*, 658 F.3d at 723.

This internet commentary does not establish plaintiff is at risk of retaliation. Few of the comments even reference plaintiff directly, and those that do are not threatening. In fact, the commenters criticizing plaintiff specifically disavow violence. Lawsuits about religion "frequently ha[ve] a tendency to inflame unreasonably some individuals...." *Id.* at 724. While "it cannot be denied that the record in this case contains some indications of disapproval and frustration by some local citizens for bringing this suit," *Doe v. Beaumont Indep. Sch. Dist.*, 172 F.R.D. 215, 217 (E.D.Tex.1997), this evidence does not establish the need for anonymity.

This point is well-illustrated in a line of cases arising out of the District of Hawaii, in which the court found that hostile and threatening online comments, emails, and phone calls did not warrant anonymity. In *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate,* No. 08–00359, 2008 WL 4755674 (D.Haw. Oct. 28, 2008), the plaintiffs argued they would be subjected to physical, economic, and social harm from the public at large if their identities were disclosed. They cited as evidence internet comments posted anonymously in response to news articles about the litigation that are similar in tone to, and perhaps even more incensed and caustic than, those at issue in the instant case.

In his first opinion in *Kamehameha Schools,* the magistrate judge focused on four comments out of those initially offered into evidence that conceivably could have been directed at the plaintiffs. *Id.* at *4. The first two comments suggested it would be fun for the school to "celebrate Kill Haole [15] Day" and asked, "why go somewhere youre [sic] not wanted? Youre jus [sic] gonna get lickens everyday and drop out anyway, so why bother?" The magistrate judge dismissed these comments because they were aimed at "how Plaintiffs might be treated if they are admitted to Defendants' school," and the plaintiffs had stated explicitly that they were not fearful of retaliation at the school should they be admitted. *Id.* The third comment stated the plaintiffs and their families should be ashamed of themselves and called on Kamehameha Schools to "be the Warriors for all of us Hawaiians now." *Id.* The fourth comment regarding the plaintiffs' decision to bring the lawsuit stated, "What they're doing ... will come around one way or another back to them. Karma do[es] happen." *Id.* (alteration in original). The magistrate judge held "[t]hese

---

**15.** " 'Haole' is a Hawaiian word often used to described a Caucasian person." *Kamehameha Sch.,* 2008 WL 4755674, at *4 n. 6 (quoting *Chenoweth v. Maui Chem. & Paper Prods., Inc.,* No. 07–00092, 2008 WL 4107906, at *7

n. 3 (D.Haw. Sept. 3, 2008)). The dispute in *Kamehameha Schools* centered around the school's admission policy of granting a preference to students with Hawaiian ancestry.

comments are not threats but do voice the commentators' frustration with this lawsuit, as do other comments in Plaintiff's Exhibits," and ultimately found this factor weighed in favor of denying anonymity. *Id.*

The parties then moved for reconsideration, offering additional evidence of reactions from the public to the lawsuit, which the plaintiff claimed "demonstrate convincingly that Plaintiffs' fear of harm if their identifies are revealed to the public is reasonable."[16] 2008 WL 5423191, at *1 (D.Haw. Dec. 31, 2008). This evidence consisted of online comments referring to the plaintiffs as "chicken s* * *," and stating "Sacrifice them!!!!!!!!" *Id.* An email sent to the plaintiffs' counsel called him a "JEWISH S* * *HEAD" and stated, "if I see you ever in public . . . no worries . . . I will SPIT on you . . . and YOU will throw the first punch . . . and believe me . . . it will be my pleasure to beat the crap out of you. . . ." *Id.* at *2. One anonymous caller to the plaintiff's counsel stated, "So good for you that everyone is going to know who your clients are. Now, both you and your haole clients can get the lickins' [sic] you deserve. . . ." *Id.*

Notwithstanding this new evidence, the magistrate judge declined to reverse his previous ruling denying anonymity. The magistrate judge held that the new evidence "is of the same character and nature as the evidence this Court previously considered and is no more probative of a severe threat of harm or a reasonable fear of harm." *Id.* at *3. He noted that many of the alleged threats were accompanied by statements of non-violence and that the proffered comments were few among hundreds of internet comments posted in response to the news articles on the litigation. *Id.* The court stated:

> [E]very major story posted online by the Honolulu Advertiser and Honolulu Star Bulletin stirs a parade of off-the-wall anonymous commentary. Indeed, a hallmark of the internet is that people may post comments anonymously or under pseudonyms and the public may never know their true identities. This invites commentators to make outrageous statements under a veil of secrecy.
>
> . . . .
>
> . . . .
>
> Plaintiffs' evidence confirms that, under the cloak of anonymity, people will make outrageous, offensive, and even nonsensical statements. The evidence does not warrant anonymity, however.

*Id.* at *3–4. The magistrate judge's opinion was upheld by the district court, 2009 WL 308351 (D.Haw. Feb. 6, 2009), and ultimately affirmed by the Ninth Circuit. 596 F.3d 1036 (9th Cir.2010). *reh'g denied,* 625 F.3d 1182 (2010), *cert. denied,* — U.S. ——, 131 S.Ct. 2448, 179 L.Ed.2d 1210 (2011). The Ninth Circuit held that "[t]he magistrate judge correctly recognized that many times people say things anonymously on the internet that they would never say in another context and have no intention of carrying out." 596 F.3d at 1045. The same is true with respect to the internet commentary posted in reaction to the instant case.[17] The online discord over this litigation, distasteful and offensive as some of the comments may be, does not create a risk of retaliatory harm.

---

**16.** The court evaluated the motion to proceed pseudonymously in *Kamehameha Schools* using the factors set forth by the Ninth Circuit in *Does I–XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1068 (9th Cir.2000): (1) the severity of threatened harm; (2) the reasonableness of the plaintiffs' fears; (3) the plaintiffs' vulnerability to retaliation; (4) the precise prejudice to defendants; and (5) whether the public's interest would be best served by requiring the plaintiffs to reveal their identities.

**17.** The fact that the internet commentary offered as evidence in this case has commenters' names associated with it does not make it more likely that these people will inflict harm on plaintiff. The court finds just the opposite to be true. *See United States v. Bagdasarian,* 652 F.3d 1113, 1126 n. 5 (9th Cir.

**5.**

Although plaintiff's identity apparently is no secret to the Board, her motion makes but one reference to any untoward comments directed at her. In her declaration, plaintiff avers that at the September 6, 2011 Board meeting, "someone said something to me about 'Jew speak.' That comment, along with the general feeling of anger and defiance among those attending the meeting, made me feel uncomfortable and unsafe should my identity become known." Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 7. Plaintiff does not elaborate on the context in which this comment was made or what she perceived it to mean. Certainly, such a comment can be considered to be offensive and unpleasant, but plaintiff does not assert, and the court cannot infer, that this comment was threatening or carried with it a risk of retaliatory harm.

**C.**

Plaintiff also presents as evidence a copy of a letter she states she received on October 11, 2011 from someone purporting to be the Grand Dragon of the local Ku Klux Klan chapter. Suppl. Decl. of Jane Doe, Dkt. # 22, at Ex. 1 Attach. A. She asserts this letter makes her "extremely fearful, as it indicates that [she is] being monitored by one of the most violent hate groups in American history." *Id.* at Ex. 1 ¶ 3. She further claims to fear that if the Ku Klux Klan confirms her identity, it will "target [her] for the kind of violence and intimidation for which the group is known." *Id.* This letter, addressed to plaintiff and postmarked Callands, Virginia,[18] reads in full:

9–29–2011

Ms. Hudson

Thought you might be interested to know the K.K.K. met on Monday Night.

The meeting was not about the black community, it was about who made the complaint to the ACLU about prayer.

Your name was brought into the mix as a person of interest. We have instructed our atty. to file every F.O.I.A. available to verify the person that filed the complaint.

Will keep you posted!

Grand Dragon

XXX

*Id.* at Ex. 1 Attach. A. Plaintiff acknowledges that this letter does not contain an explicit threat but argues "the use of the K.K.K. name is inherently threatening." Pl.'s Reply Br., Dkt. # 22, at 2.

The Board, on the other hand, argues there is "no evidence that this is an authentic communication from the 'Grand Dragon' of the local KKK." Defs.' Suppl. Mem. In Support of Opp. to PL's Use of Pseudonyms (hereinafter "Defs.' Suppl. Br."), Dkt. # 33, at 3. Regardless of its authenticity, however, this letter is disquieting. It clearly was sent in an effort to intimidate plaintiff. The Ku Klux Klan has a history in this country of brutal violence and instilling fear in its victims through harassment and intimidation. A document professing to be a communication from the Ku Klux Klan is not something the court takes lightly.

But it cannot be said that this letter threatens plaintiff or even contains a veiled threat of violence. The letter proves that the Ku Klux Klan strongly suspects plaintiff's identity and her involvement in this litigation. Yet there is no evidence that plaintiff has been subjected to any harassment or violence, let alone the type of intimidation and threats of violence for

---

2011) ("The majority acknowledges that speaker's anonymity can render a statement more threatening.").

**18.** Callands is in Pittsylvania County, Virginia.

which the Ku Klux Klan is known, *see, e.g.,* *Virginia v. Black,* 538 U.S. 343, 354, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (noting Klan often uses cross burnings as a tool of intimidation and a threat of impending violence), in the months since the letter was sent.

By finding the letter not to be overtly threatening, the court in no way wishes to minimize plaintiff's concerns. Decisions such as this require a delicate balancing of factors, and the court has considered the letter carefully in assessing the risk of retaliatory harm in this case. The court does not find, however, that it tips the scales in favor of anonymity.

### D.

In sum:

With respect to the public at large, it cannot be denied that the record in this case contains some indications of disapproval and frustration by some local citizens for bringing this suit. The threat of hostile public reaction to a lawsuit, however, "will only with great rarity warrant public anonymity."

*Doe v. Beaumont Indep. Sch. Dist.,* 172 F.R.D. 215, 217 (E.D.Tex.1997) (quoting *Doe v. Stegall,* 653 F.2d 180, 186 (5th Cir. Unit A 1981)). This is not one of those rare cases like *Stegall* where anonymity is justified.

*Stegall* involved a challenge to the constitutionality of prayer and Bible reading exercises in Mississippi public schools. The plaintiffs, a mother and her two children, moved for a protective order that would allow them to proceed under fictitious names. The plaintiffs feared "harassment and violence directed against the Roe family generally and the Doe children in particular" should their identities become known to the public. 653 F.2d at

182. In support of their motion, the plaintiffs offered as exhibits local newspaper reports of the public's reaction to the lawsuit, as voiced at a school board meeting. *Id.* at 182 n. 6. In one excerpt from an article quoted in the court's opinion, a school board member opined that the lawsuit was filed because the plaintiffs' lawyer, who was Jewish, "wants to destroy Christianity," and county residents stated, *inter alia,* that "Christians must beat the evil out of these people," and, that they "have got to band together and whop this evil thing." *Id.* Reversing the district court's decision denying the plaintiff's request for anonymity, the Fifth Circuit found that "the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a Rankin County community hostile to the viewpoint reflected in plaintiffs' complaint." *Id.* at 186. The court held that these threats of violence, taken in conjunction with the other factors weighing in favor of anonymity, especially the fact that the plaintiffs were children, tipped the scales "against the customary practice of judicial openness." *Id.*

*Stegall* is distinguishable from the instant case in two principal ways. First, there is no record of any threat made against plaintiff in this case, and she has not established the likelihood of retaliatory physical harm. *Cf. id.* at 182 n. 6 (county residents stated Satan was "working his evil on these people filing this suit" and that "Christians must beat the evil out of these people" and must "band together and whop this evil thing"). Secondly, this case does not involve a child-plaintiff, a factor the *Stegall* court found "especially persuasive." *Id.* at 186; *see also id.* at 186 ("[W]e view the youth of these plaintiffs as a significant factor in the matrix of considerations arguing for anonymity here.").[19]

---

**19.** The instant case also stands in contrast to

cases such as *Doe v. Porter,* 370 F.3d 558, 561

█ "The potential for physical harm and the corresponding need for anonymity must be considered in light of the particular circumstances of each case and the factual record established by the moving party." *Freedom From Religion Found. v. Cherry Creek Sch. Dist.*, No. 07–cv–02126–MSK, 2009 WL 2176624, at *6 n. 6 (D.Colo. July 22, 2009). The record in this case does not support a finding that there is a risk of retaliatory harm to plaintiff. As such, this factor militates against anonymity.

## IV.

A few other factors not specifically identified by the court in *James v. Jacobson*,[20] but still relevant to this analysis, bear mention here.

█ The Board argues that plaintiff should not be permitted to proceed anonymously because she is a "public figure." Defs.' Mem. In Opp. to Pl.'s Mot. For Leave to Proceed Using Pseudonyms and for Protective Order (hereinafter "Defs.' Br."), Dkt. # 16, at 5. At least one circuit specifically listed this as a factor to be considered by courts weighing requests for anonymity. In *Doe v. Megless*, 654 F.3d 404, 409–10 (3d Cir.2011), the Third Circuit endorsed a non-exhaustive list of factors first articulated by the district court in *Doe v. Provident Life & Acc. Ins. Co.*, 176 F.R.D. 464, 467 (E.D.Pa.1997), to be

weighed both in favor of anonymity and in favor of the traditional rule of openness.[21] *Megless*, 654 F.3d at 409. One of the factors disfavoring anonymity is "whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant[s'] identities, beyond the public's interest which is normally obtained." *Id.* (citing *Provident Life*, 176 F.R.D. at 467–68).

Cases arising out of the Third Circuit and elsewhere provide little guidance in terms of who qualifies as a public figure in the context of an anonymity analysis. At least one district court has suggested that the consideration of a public figure's involvement in a case is associated with "the public need to follow their activities in order to prevent abuse of some public trust." *Lozano v. City of Hazleton*, 496 F.Supp.2d 477, 513 (M.D.Pa.2007), *aff'd in part and vacated in part on other grounds*, 620 F.3d 170 (3d Cir.2010). *cert. granted and judgment vacated and remanded*, — U.S. ——, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011) (remanded for further consideration in light of *Chamber of Commerce v. Whiting*, 563 U.S. ——, 131 S.Ct. 1968, 179 L.Ed.2d 1031(2011)).

On the other hand, the court in *Megless* focused on the status of the defendants as public officials in analyzing this factor. Considering the public interest in knowing

(6th Cir.2004) (upholding decision to allow plaintiffs to proceed pseudonymously given hostile environment in case involving "very young children, to whom we grant a heightened protection"), and *Doe v. Barrow County*, 219 F.R.D. 189, 193 (N.D.Ga.2003) (a case not involving children but where, in addition to a hostile public reaction to the suit, at least one member of the community attempted to intimidate the judges of the court through angry and inappropriate phone calls).

**20.** As noted in the Memorandum Opinion on Plaintiffs Motion for Leave to Proceed Using Pseudonyms and for Protective Order, the *James* court made clear that its list of factors was not meant to be exhaustive. 6 F.3d at 238.

**21.** The Third Circuit found this *Provident Life* test had been applied without difficulty by district courts and did "not conflict with the tests that have been adopted by [its] sister circuits," such as the Fourth Circuit's *James* test. *Megless*, 654 F.3d at 408–09.

the litigants' identities, the Third Circuit held that the interest was "heightened because Defendants are public officials and government bodies," thereby supporting disclosure of plaintiff's identity.[22] 654 F.3d at 411 (quoting *Doe v. Megless*, No. 10–1008, 2010 WL 3076246, at *4 (E.D.Pa. Aug. 5, 2010) (citing *Provident Life*, 176 F.R.D. at 468)).

The Board asserts that plaintiff has been an outspoken critic of the Board. As a citizen of Pittsylvania County, she has written numerous letters to the editors of local news outlets espousing her views on a variety of topics including the Danville–Pittsylvania Regional Industrial Facility Authority, uranium mining, economic issues, and local political races. Defs.' Br., Dkt. # 16, at 2, Ex. 2; Defs.' Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 26, at Ex. 1; Defs.' Second Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 37, at Ex. 1. A number of these letters to the editor reference the Board. Additionally, in her capacity as a lawyer, plaintiff has advocated on behalf of several clients who have filed lawsuits against the Board. The Board asserts that "[p]laintiff's attempted use of a pseudonym in this case, after being the public 'tip of the spear' in numerous previous actions against the Board, is disingenuous and without merit." Defs.' Br., Dkt. # 16, at 6.

For her part, plaintiff argues that her occupation as a practicing attorney does not make her "a person of general renown in the community." Pl.'s Reply Br., Dkt. # 22, at 4. The court agrees that plaintiff's legal work does not turn her into a public figure for purposes of this analysis. But plaintiff has done more than merely represent clients suing the Board. She has criticized the Board publicly, calling them "backward-looking," xenophobes, and perpetrators of "self-dealing and wasteful spending," and she has openly shared her personal beliefs on political and socials issues that impact the Board. Defs.' Br., Dkt. # 16, at Ex. 2; Defs.' Suppl. Ex. In Support of Defs.' Mem. In Opp. To Pl.'s Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 26, at Ex. 1. Most recently, plaintiff publicly opined that that the Board's chairman, Tim Barber, "has been incapable of performing any of the duties of [B]oard chairman that require him to read the English language." Defs.' Second Suppl. Ex. In Support of Defs.' Mem. In Opp. To PL's Mot. For Leave to Proceed Using Pseudonyms, Dkt. # 37, at Ex. 1. She also stated that the re-election of the vice chairman of the Board "is further tribute to the determination of our current [B]oard to preserve the status quo, namely that the absence of basic education skills and blatant displays of ignorance are acceptable criteria for holding the highest elected offices in Pittsylvania County government." *Id.* Clearly, plaintiff does not hide her disdain for the Board.[23] Still, plaintiff's activities do not make her a holder of the public trust; the public does not have an interest in monitoring her

---

**22.** This court previously discussed the fact that defendants are governmental entities supra, in § II. D. of the Memorandum Opinion on Plaintiffs Motion for Leave to Proceed Using Pseudonyms and for Protective Order.

**23.** Indeed, the public nature of the stands plaintiff has taken against the Board on argu-

ably controversial political and social issues undermines somewhat her argument that she is fearful of retaliation in this case. Granted, the issues on which she has taken a public stand in the past did not involve plaintiff's personal religious beliefs, but her often-voiced public criticism of the Board demonstrates that she is no shrinking violet.

activities to ensure its trust has not been breached.

While there is little case law defining "public figure" in the context of anonymity requests, there are cases defining "public figure" within the contours of First Amendment-driven defamation law.[24] Three types of "public figures" appear in defamation law: (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551–52 (4th Cir.1994) (citing *Gertz v. Welch, Inc.*, 418 U.S. 323, 345, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). The evidence presented here does not establish that plaintiff occupies a position "of such persuasive power and influence," *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997, that she could be considered an "all-purpose public figure." Even assuming, without deciding, that plaintiff's letters to the editor and other similar activities turn her into a "limited-purpose public figure," she would only be considered a public figure with respect to the issues in which she invited "attention and comment" by thrusting herself "to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* The Board's Christian prayer practice does not appear to be one of the public controversies as to which plaintiff has thrust herself into the limelight.

That said, before the issue became a matter of public controversy, plaintiff made an open email request to the Board that it cease its practice of Christian prayer. Although plaintiff claims that she has not disclosed her participation in this suit to anyone other than her five closest friends, Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 3, she made no attempt to disguise her identity when she sent an email to Pittsylvania County Attorney Vaden Hunt, legal counsel to the Board, on August 11, 2011, stating:

> I[n] light of the 4th Circuit Court of Appeals['] recent ruling [i]n *Joyner et al. v. Forsyth County, N.C.,* No. 10–1232 (published), I am requesting that the Pittsylvania County Board of Supervisors be required to cease and desist naming Jesus Christ in the prayers that begin each and every meeting of the Pittsylvania County Board of Supervisors. To a non-Christian such as myself, the Supervisors' references to Jesus Christ as the guiding spirit in their invocation of a deity is not only offensive; it is also exclusionary and constitutes a political view that citizens in this County who do not subscribe to the tenets of Christianity and Jesus Christ are somehow "less than" and "unequal to" the majority population that does, including the elected officials making these invocations.
>
> I would appreciate your attention to this matter. Unlike Forsyth County, where the references were less than 100%, in Pittsylvania County the invocations "In Jesus['] name" have been 100%.
>
> Very truly yours,
>
> Barbara Hudson

Defs.' Br., Dkt. # 16, at Ex. 1. Plaintiff did not send this email anonymously, nor did

---

24. The court makes no finding as to whether the defamation law definition of "public figure" is the correct one to apply in this context.

she ask that her name be kept confidential or otherwise not be associated with this request that the Board cease naming Jesus Christ in its opening prayers. Certainly, she intended for this email to be passed along, at the very least, to the members of the Board. There is no evidence to establish how many other people have seen this email or know that plaintiff sent it. But it is not lost on the court that plaintiff took no measures whatsoever to hide her identity in it. Even though plaintiff sent the email before this lawsuit commenced, it is not hard to make the connection between this email request that the Board stop invoking the name of Jesus Christ and the Establishment Clause lawsuit that soon followed.[25]

## V.

As the Fourth Circuit noted in *Joyner v. Forsyth County,* "George Washington once observed that '[r]eligious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause.'" 653 F.3d 341, 355 (4th Cir.2011) (quoting a Letter from George Washington to Edward Newenham (June 22, 1792)), *cert. denied,* —— U.S. ——, 132 S.Ct. 1097, 181 L.Ed.2d 978 (2012). For this reason, courts must engage in a careful balancing of factors in determining whether to allow a plaintiff to proceed anonymously in a case such as this.

Indeed, "[f]ew tenets of the United States justice system rank above the conflicting principles presented in this case: the transparency and openness of this nation's court proceedings and the ability of private individuals to seek redress in the

courts without fear for their safety." *Kamehameha Sch.,* 596 F.3d at 1038. The court is mindful of plaintiff's fears of retaliation. But the need for anonymity in this case is not so compelling as to override the "paramount importance of open courts." *Id.* at 1046. The court must consider "whether identification poses a risk of retaliatory physical or mental harm" to plaintiff or, "even more critically, to innocent non-parties." *James,* 6 F.3d at 238. There is no evidence of any risk to nonparties here. And the evidence does not strongly suggest that plaintiff herself is at risk of retaliatory conduct. The record is full of "indications of disapproval and frustration by some local citizens," *Doe v. Beaumont Independent School District,* 172 F.R.D. 215, 217 (E.D.Tex.1979), but there have been no threats made towards plaintiff. In fact, affirmative statements of non-violence appear amidst the alleged "virulent reactions," "hateful messages," and "hostility" posted on online discussion boards. Decl. of Jane Doe, Dkt. # 4, at Ex. 1 ¶ 6. Even the letter purportedly sent by the Grand Dragon of the Ku Klux Klan cannot be read as a threat of violence. The court fully appreciates why this letter would be distressing to plaintiff. But mere receipt of the letter does not give rise to a risk of retaliatory harm.

The fact that: (1) this case invokes plaintiff's personal religious beliefs, "a quintessentially private matter," *Stegall,* 653 F.2d at 186; (2) this case involves a single constitutional question; and (3) the Board is not prejudiced by her use of a pseudonym, all militate in plaintiff's favor.

---

25. Courts have considered the extent to which plaintiffs identity has been kept confidential in weighing requests for anonymity. *See Megless,* 654 F.3d at 408; *see also M.M. v. Zavaras,* 139 F.3d 798, 803 (10th Cir.1998) (finding anonymity not appropriate where those who presumably harbored animosity towards plaintiff already knew plaintiff's identity); *Doe v. Beaumont Independent Sch. Dist.,* 172 F.R.D. 215, 217 (E.D.Tex.1997) (same); *Doe v. Hallock,* 119 F.R.D. 640, 644 (S.D.Miss. 1987)(same); *Doe v. Shakur,* 164 F.R.D. 359, 362 (S.D.N.Y.1996) (same).

Weighing strongly against anonymity, however, is the fact that plaintiff is an adult, a practicing lawyer, who in the past has taken public stands on controversial political and social issues that involve the Board. Plaintiff is not a minor who might be entitled to greater protection in this type of case. Perhaps the most significant factor in the calculus to be weighed by the court is the fact that plaintiff emailed the Board and took a position under her name demanding the same thing she seeks in this lawsuit. Nothing in her email request suggests confidentiality or raises any concern that her identity be masked. It is difficult, if not impossible, to square plaintiff's open email request to the Board that it cease its practice of Christian prayer with her request to the court a month later that she be allowed to proceed anonymously.

Weighing all of the equities, and under the circumstances present in this particular case, the court finds that the balance tips in favor of disclosing plaintiff's identity. This is simply not one of those critical cases that warrants anonymity. *See James*, 6 F.3d at 238. Plaintiff's concerns "are not so extraordinary as to outweigh the inherent public interest in transparent judicial proceedings." *F.B. v. East Stroudsburg Univ.*, No. 3:09cv525, 2009 WL 2003363, at *4 (M.D.Pa. July 7, 2009). As such, plaintiff's motion will be **DENIED.**